Martha P. McALLISTER

v.

The UNITED STATES.

No. 566–81C.

United States Claims Court.

Sept. 19, 1983.

Paul A. Kiefer, of Kiefer & Morrison, Washington, D.C., for plaintiff.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge.

Martha P. McAllister is a civilian schoolteacher working for the Department of Defense Dependent School (DODDS) system in England. At issue in this case is Ms. McAllister's eligibility for Permanent Change of Station (PCS) orders and a Living Quarters Allowance (LQA) under the Defense Department Overseas Teachers Pay and Personnel Practices Act.[1] The government initially granted plaintiff PCS orders and the related LQA but subsequently revoked that decision, finding that it was granted in error. Plaintiff filed a grievance to protest the revocation. At the subsequent hearing, the issue examined was whether the disallowance of plaintiff's PCS orders and LQA was proper. The hearing examiner found that it was, recommending that the grievance be denied. The military commander who reviewed the case accepted this recommendation and issued a final decision affirming the disallowance. Plaintiff then filed suit in this court, maintaining that the initial decision to grant her PCS orders and the LQA was proper. She seeks the travel monies and relocation and living quarters allowances that were initially authorized.

This case is before the court on cross-motions for summary judgment pursuant to RUSCC 56. The parties are in agreement on all facts necessary to a resolution of the case. Upon a review of the motions presented, along with the supporting documents and following oral argument of counsel, it is concluded that defendant improperly reversed its initial decision that plaintiff was entitled to PCS orders and the LQA. Therefore, plaintiff's motion for summary judgment is allowed and defendant's cross-motion for summary judgment is denied.

The sequence of events giving rise to plaintiff's claim is as follows.

### Facts

Ms. McAllister was stationed at the High Wycombe Elementary School in High Wycombe, England, until that facility closed in 1980. She was reassigned to the West Ruislip Elementary School in West Ruislip, England, some sixteen miles from her old duty station. Both High Wycombe and West Ruislip are in the London area. While she worked in High Wycombe, Ms. McAllister lived in Marlow, where she owned a home purchased with LQA payments.

The LQA is a housing supplement granted to overseas employees "for the annual cost of suitable, adequate, living quarters for the employee and his/her family." Department of State Standardized Regulations (Government Civilian, Foreign Areas) ch. 131.1. The LQA rates were "designed to cover substantially all of the average employee's costs for rent, heat, light, fuel, gas, electricity, water, taxes levied by the local government and required by law or custom to be paid by the lessee, insurance required by local law to be paid by the lessee, and agent's fee required by law or custom to be incurred by landlord and paid by lessee." *Id.* ch. 131.3.

If an overseas employee chose to purchase a home rather than rent, the employee received an LQA equivalent to an amount up to ten percent of the original purchase price of the home, which was deemed to be the employee's estimated annual expense for rent. *Id.* ch. 136. In addition, the employee received an allowance for utilities and other expenses. The payment of the rental or purchase portion of the allowance was limited to a ten-year period, after which the employee could receive an allowance for utilities only. LQA payments were renewable for a second ten-year period if a new overseas assignment extended the employee's daily commute after the reassignment, and the employee met

1. Act of July 17, 1959, Pub.L. No. 86–91, §§ 7–8, 73 Stat. 213, 216 (codified as amended at 20 U.S.C. §§ 905–906 (1976)).

certain eligibility requirements for PCS orders.

Ms. McAllister applied for PCS orders upon reassignment. The individual authorized to determine eligibility for PCS orders at the time was the acting Civilian Personnel Officer (CPO), Mr. Jeffrey M. Dander.[2] In a letter dated September 8, 1980, Dander sought the following information from plaintiff in order to process her request:

1) distance and travel time from the old duty station to the old residence;

2) distance and travel time from the new duty station to the old residence;

3) distance and travel time from the old duty station to the new residence;

4) distance and travel time from the old duty station to the new residence.[3]

Dander requested distance and travel time "in terms of the fastest direct travel route under normal traffic conditions."

On October 10, 1980, Dander informed plaintiff by letter that "[b]ased upon available evidence, you are eligible for PCS travel, and under the terms of STANREGS and Air Force interpretation of them to a new 10 year limit on purchase of Privately Owned Quarters." On October 22, plaintiff wrote Dander with a correction of the distance from her old home to her new duty station, a reduction of some fourteen miles. Dander determined, however, that this did not change plaintiff's status, and he so informed her on October 29, 1980.

Pursuant to the notice of eligibility for PCS orders and the LQA, plaintiff changed her residence from Marlow to Ickenham, incurring expenses that she believed would be reimbursed. However, on November 12, Mr. William T. Walker, Dander's superior, wrote to plaintiff as follows:

After consultation with DODDS–A I have decided that the original determination of your eligibility for PCS orders as a result of your reassignment * * * was in error. After consideration of the criteria

in paragraph C4108 of the JTR [Joint Travel Regulations] I have determined that the relative commuting time between your residence and the old and new duty station is such that PCS orders are not appropriate.

The consultation with DODDS–A to which Mr. Walker alluded was apparently a phone conversation with Mr. Singleton, the Personnel Director of DODDS Atlantic Region. While Singleton's office was available to advise and support Walker's office, the local CPO actually had the responsibility for making PCS and LQA decisions.

On November 27, plaintiff wrote to Mr. Singleton asking for clarification of JTR C4108. The response came from Mr. Walker. On December 3, he sent plaintiff a letter containing the text of JTR C4108 without elaboration. Ms. McAllister, dissatisfied with the outcome of her PCS request, filed a grievance protesting Walker's action.

On April 7, 1981, the Air Force conducted a factfinding inquiry into the McAllister grievance. At that time, Walker was given the opportunity to present his reasons for revoking the PCS orders and LQA. Walker testified that he became aware of the McAllister matter at the end of October, while going through his "read" file, and began to question Dander's decision. He spoke by phone with Singleton at DODDS–A in early November, and Singleton agreed that Dander's decision was wrong. Walker testified that he felt "it was a very close case, but that PCS orders should not be issued."

At the hearing, Walker explained the criteria of JTR C4108 and the facts in plaintiff's case. He then stated:

The 16 mile difference [between plaintiff's old residence and old duty station compared with the old residence and new duty station] *makes her basically eligible for PCS.* But in looking at the commuting situation, almost all, except for a few miles of the additional 16 miles, would be

---

2. Mr. Dander was acting for William T. Walker, the Civilian Personnel Officer at Upper Heyford.

3. In the hearing examiner's report, this final criterion was interpreted to have meant the distance and travel time from the new duty station to the new residence.

motorway. As I say, it was a very close case. The additional 20 to 25 minutes that she would have to drive each way didn't seem to me to be unreasonable. Large numbers of people, both in England and the United States, have to commute 40 minutes or even longer each way every day. It is not an unusual commuting time, driving time, and I do consider High Wycombe and Marlow to be in the West Ruislip commuting area. The large numbers of people from the High Wycombe area do commute to the London area each day, particularly the suburbs on the West Ruislip side of London. *So, I just felt that although it was a tough decision to make, that based on the exercise of good judgment, that her PCS orders are not to be issued and it was a good, in faith decision on my part and that is basically the reason why I made that decision.*

(Emphasis added.)

Walker noted that while an individual could meet all the objective criteria set out in the regulation, all the facts and circumstances of a case had to be considered in making a decision. He admitted, however, that there was no established policy with respect to commuting time and PCS orders, and that ordinarily one relied not on a specific policy but rather on decisions made by CPOs in the past. Walker stated that no published materials establish any guidelines for applying JTR C4108.

The hearing examiner concluded that resolution of whether plaintiff was entitled to PCS orders turned on the meaning of the term "relative commuting time" in JTR C4108–4.[4] He noted not only that Walker was not aware of any specific guidance as to JTR C4108, but also that "[p]aragraph C4108–4 appears to give the deciding official some latitude in approving these actions." He further commented that "the regulation hedges and gives the travel approving official discretionary leeway" and "does not provide any magic number be-

yond which a person meets the requirements."

The examiner acknowledged in his report that Dander was the person authorized to make PCS decisions binding on the agency. However, he then stated that "in the opinion of the examiner, since Dander was acting for Walker, the latter has the authority to countermand this type of action." He thus concluded that "[i]n the final analysis, the question to be answered is whether or not Walker's decision was reasonable with regard to part four of paragraph C4108 of the Joint Travel Regulation."

In support of Walker's decision, the examiner noted that a twenty-one-mile/forty-minute commute seemed to be comparable to the "commuting distances of others serviced by his organization, therefore not unreasonable." He cited specifically the commuting time of two of plaintiff's colleagues, Wilson and Palmer, who had twenty-one- and twenty-five-mile, half-hour commutes from their old residences to their old duty station at Upper Heyford. After reassignments, which were unconnected to the High Wycombe school closing, the two received PCS orders when their new commutes involved fifty-five to sixty miles and driving time of an hour or more.

Before she was reassigned, plaintiff had a five-mile, fifteen-minute commute between her old house and old duty station. The one-way commute between plaintiff's old house and new duty station was twenty-one miles and took approximately forty minutes to drive. After her move, plaintiff had a one-half mile, three-to-five-minute commute. Plaintiff thus cut her one-way commuting time by at least thirty-five minutes and twenty miles.

*Discussion*

The benefits plaintiff seeks are part of the allowances authorized as a means of inducing persons to accept overseas employment with the Department of Defense by providing them with remuneration com-

---

4. "Relative commuting time" is one of several factors listed in the second paragraph of JTR C4108 to guide the CPO in his determination of

whether the fourth criterion of the regulation is met. The complete regulation is quoted on p. 398, *infra*.

mensurate with that of their colleagues in the United States. *See Acker v. United States,* 223 Ct.Cl. 281, 286–87, 620 F.2d 802, 804–05 (1980). The Secretary of State was given the authority to promulgate regulations to carry out the program. *See* Exec. Order No. 12228, 45 Fed.Reg. 49903 (1980). The regulation at issue in this case, Joint Travel Regulation C4108, provides as follows:

C4108 CHANGE OF STATION WITHIN SAME CITY OR AREA

Travel, transportation, and other related allowances, as applicable, will be authorized incident to a permanent change of station even though the old and new permanent duty stations are located within the same city or area provided that the transfer:

—1. is in the interest of the Government,

—2. is to a new permanent duty station which is at least 10 miles distant from the old permanent duty station,

—3. is not primarily for the convenience or benefit of the employee or at his request,

—4. relocation of the residence is incident to the transfer.

In determining that the relocation of the residence is incident to the transfer, the travel-approving official should take into consideration such factors as commuting time and distance between the employee's residence at the time of notification of the transfer and his old and new duty stations as well as the commuting time and distance between a proposed new residence and the new duty station. Ordinarily, a relocation of residence should not be considered as incident to a permanent change of station unless the one-way commuting distance from the old residence to the new duty station is at least 10 miles greater than from the old residence to the old duty station. Even then, circumstances surrounding a particular case, for example, relative commuting time, may suggest that the relocation of residence was not incident to the transfer.

▮ Although neither party briefed this point, central to the resolution of this case is the right of an agency to reconsider and reverse its final decisions. As a general rule, an agency has the right to correct its errors, and "reconsideration is often the sole means of correcting errors of procedure or substance." *Bookman v. United States,* 197 Ct.Cl. 108, 111, 453 F.2d 1263, 1265 (1972); *see also Dillon v. United States,* No. 366–80C, order at 5–6 (Ct.Cl. Dec. 1, 1981). But barring a showing of error, an agency may reconsider its final decision only if the reconsideration is timely and the parties have not adversely changed their positions in reliance on that decision. *See, e.g., Biddle v. United States,* 186 Ct.Cl. 87, 100–01 (1968). How quickly an agency must act in reconsidering its decision depends to a large extent on how that reconsideration will affect the individuals involved. Whether the parties have in the meantime changed their positions, and the reasonableness of any modification, may also be factors that affect the agency's right to reconsider. If the parties act on the initial decision, however, and if the agency knows they will act, then the agency may reverse its initial decision only upon a showing that it was erroneous.

In the present case, Mr. Dander approved Ms. McAllister's request for PCS orders and the LQA with full knowledge that she would act on his decision. Upon receiving notice of the award, Ms. McAllister bought a new home and moved from Marlow to Ickenham. This was exactly the action that Dander had contemplated. Defendant has made no claim that Ms. McAllister had notice, prior to her purchase of the house and move, of Walker's intended reconsideration of the award. Thus, even though Walker may have acted quickly in reversing Dander's decision, the reconsideration was untimely. Therefore, in order to affirm the agency's revocation of the LQA, this court must find some error in Dander's initial decision of award.

The government does not argue that Ms. McAllister failed to meet the first three of the criteria in JTR C4108. Nor does it contest that she met the only objective con-

sideration listed in the second paragraph of the regulation, that the distance from her old residence to her new duty station be at least ten miles greater than from her old residence to her old duty station. However, the government does argue that plaintiff failed to meet criterion four because the CPO erred in finding that her post-transfer commute was unreasonable, and thus erred in finding the move incident to the transfer.

Basic to a resolution of the issue before the court is the establishment of Mr. Dander's authority to make decisions regarding plaintiff's rights to PCS orders and an LQA. The factfinding record assembled by the hearing examiner leaves little doubt of the power vested in Mr. Dander. Indeed, that record clearly establishes that Mr. Walker delegated the authority to Mr. Dander to make a determination of plaintiff's entitlement. Mr. Walker specifically testified that Mr. Dander was authorized to decide whether the plaintiff was entitled to PCS orders.

The court must affirm Mr. Dander's decision if it concludes that he acted within the scope of his authority. Before proceeding with a determination of Mr. Dander's authority, it is important to bear in mind the long-standing admonition that in dealing with the government it is absolutely essential that the authority of the government's representative be explicitly defined. *Montilla v. United States,* 198 Ct.Cl. 48, 62–63, 457 F.2d 978, 985–86 (1972).

■ It is, of course, fundamental that all acts performed by a duly appointed agent of the government which fall within the scope and bounds of his authority are binding on the defendant. On the other hand, as the Supreme Court stated in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947):

> The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.

■ Thus, in the case at bar it is necessary to determine if Mr. Dander, as acting CPO, properly stayed within the scope of his delegated authority in determining that plaintiff was entitled to PCS orders. This court must affirm the decision if he did. However, if the evidence shows to the contrary, and it can be demonstrated that Mr. Dander acted beyond his authorized scope, then, since the government cannot be bound by the unauthorized acts of its agents,[5] the decision must be reversed. On the basis of the evidence presented, there has been no showing that Mr. Dander's action was outside the scope of his delegated authority.

Defendant's arguments indicate some confusion as to the issue before this court and just what agency action is being reviewed. Defendant contends that this court should affirm the reversal of Dander's decision because Walker and the hearing examiner "properly applied the factors in criterion four of JTR C4108 in denying plaintiff's PCS orders." Whether a proper application of the regulation to the facts of this case could reasonably lead to a decision different from Dander's is not the issue, however. This court is not reviewing the reasonableness of Walker's finding that Ms. McAllister should be denied PCS orders and the LQA. Rather, this court is concerned with the entirely separate issue of the reversal of Dander's opposite finding. Defendant has failed to present any substantial reason to justify that reversal.

■ This court and its predecessor have noted, on repeated occasions, that a presumption of regularity attaches to the actions of administrative officials. *See, e.g., Crispino v. United States,* 3 Cl.Ct. 306, 311 (1983); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). The government does not dispute Dander's authority to grant Ms. McAllister the PCS orders and LQA. Consequently, it is presumed that Dander granted them in good faith and in full compliance with all applicable regulations. Defendant has offered no evidence to rebut this presumption of regularity and no acceptable evidence to support its allegation of error on Dander's

---

**5.** *See Schuhl v. United States,* 3 Cl.Ct. 207, 212     n. 8 (1983).

part. Nor could Walker or the hearing examiner point to any factual mistake, misinterpretation of policy, or misapplication of regulation by Dander. The mere allegation of error, without more, is simply not sufficient to justify the revocation of the PCS orders and LQA, once granted.

Defendant argues that, regardless of Dander's authority, the government must be able to correct errors of its agents when entitlements are involved. On this point, no quibble with defendant is necessary for defendant falls far short of meeting the standard it sets for itself. Again, though defendant claims Dander erred, no error is shown.

Dander had the authority and the duty to make final decisions on the award of PCS orders and LQAs. Having delegated this authority to Dander, the agency must have known that his decisions would be relied upon. To allow some next-ranking official to reverse those final decisions, without the least indication of error, merely because of a disagreement with the result reached would be chaotic. If Dander had committed error, if he had failed to consider all the facts, if he had failed to properly apply the regulations or had otherwise acted contrary to regulation or statute, then his decision would be subject to attack and reversal. But reversal can occur only after the error is shown and the reasons for the opposite decision clearly articulated.

From the outset, it appears that the agency's handling of the McAllister situation was beset with confusion due to both an absence of policy guidance with respect to eligibility and a poorly structured decision-making process within the agency. While JTR C4108 provided minimum criteria necessary for PCS eligibility, beyond these the decision was left to the judgment of the acting CPO, Mr. Dander. Walker testified and the hearing officer found that Dander had independent authority, delegated by Walker, to make PCS decisions. The agency established no procedure to review

Dander's decision before it was communicated to the applicant. Although the DODDS–Atlantic Region office was available to provide advice to the CPO on such personnel matters as eligibility, no advice was sought until after the award was made.[6] The seeming arbitrariness of this reversal, when the decision to grant or deny PCS orders and the LQA was so largely a matter of the CPO's discretion, is therefore particularly troubling.

The evidence proffered to justify the reversal, which can be extracted from the correspondence, exhibits, testimony, and grievance report, is that Walker concluded that PCS orders were not "appropriate" given the relative commuting time between plaintiff's residence and old and new duty stations; that this determination was based on his own judgment, with which Singleton at DODDS–A apparently concurred; that other people in England and the United States commuted as long or longer than plaintiff; that two of plaintiff's colleagues had had twenty-one- and twenty-five-mile, half-hour commutes, and upon assignment to new duty stations received PCS orders when their new commutes were fifty-five to sixty miles and took an hour or more to drive; and that Walker considered High Wycombe and Marlow to be in the West Ruislip commuting area. The last three of these are the only objective reasons presented and, for the following reasons, I find them invalid.

■ Walker's observation that other people in England and the United States have longer commutes than plaintiff's, while no doubt true, cannot provide support for the reversal. Government counsel argued that the agency interpretation of "relative commuting time," mentioned in the second paragraph of JTR C4108, means relative to others, and that Dander was in error if he did not consider this factor.

Several responses may be made to defendant's argument. First, it is not clear that the agency holds this interpretation of

**6.** When such advice was ultimately sought, it was not sought by acting CPO Dander but by his supervisor, Mr. Walker.

the term "relative commuting time". As far as can be ascertained from the record, it was never discussed in connection with the communications with the DODDS–A office. Walker cited to no agency interpretation of this expression, and in fact suggested that no agency guidance existed on this matter.

Though the regulation fails to define the term, the structure and focus of the regulation's second paragraph strongly suggest that "relative commuting time" refers to a comparison of the employee's old and new commuting time. The paragraph consists of three sentences. The first discusses commuting *time and distance* between the old residence and old and new duty stations and between the proposed new residence and those points. The focus begins, therefore, clearly on the employee's commute. The second sentence narrows the focus to just the employee's commuting *distance,* recommending a minimum increase of ten miles. The third sentence focuses on commuting *time.* The most reasonable interpretation of this sentence is that it, like the second, refers back to the first. At no point in the paragraph is the commuting time or distance of "others" mentioned. Defendant's reading of that word into the last sentence of the paragraph, when the focus throughout has been strictly on the individual employee's commute, is wholly without support.

Second, defendant failed to show that Dander did not consider this factor. Every indication is that he considered all the factors detailed in the regulation and any interpretations of them, as he stated he did in his original award letter to plaintiff. Were there any doubt about this, Dander was certainly available to testify.

Third, this discussion fails to consider the numerous factors that enter into an individual's selection of living quarters. Many people prefer to live in outlying sections of a metropolitan area. Some do so for financial and others for aesthetic reasons. Many choose a neighborhood for the recreational or educational resources it provides. Thus, it seems unfair to compare someone like plaintiff, who has consistently chosen to live close to her place of employ, to those who choose to live considerably farther from theirs. This is particularly so when the reason for plaintiff's transfer and the increase in her commuting time was the government's convenience. In addition, defendant's attempt to hold plaintiff to the standard of the general commuting population would thwart the intent of the regulation, since the regulation clearly is provided to accommodate overseas employees in the event they are inconvenienced by the government in transferring them from their original duty station.

Even if plaintiff's commute should have been considered relative to the general commuting population, this still fails to establish that Dander's decision was wrong. All parties agree that plaintiff's commuting time had to increase to some extent to make her eligible for a renewal. The regulations impose a threshold increase of at least ten miles, which in most cases would result in additional commuting time.[7] However, defendant surely does not argue that plaintiff must have had the longest possible commute before she received PCS orders. Thus we are left as before with the problem that somewhere between a commute with an additional ten miles and the longest possible commute lies the appropriate point for awarding PCS orders and the LQA. The regulations give no clue as to when this is to be done, and thus someone had to decide that point in Ms. McAllister's case. That authority was delegated to Dander.

■ Next, defendant argued that two of plaintiff's colleagues received PCS orders because of commutes of over an hour after reassignment when they had had half-hour commutes before. In a letter dated May 5, 1981, Walker pointed out to Hearing Examiner White the cases of Wilson and Palmer, who were both granted new PCS orders upon a showing that they each had fifty-five- to sixty-mile commutes that took them

---

7. In this case there is no question that the increase was sixteen miles and amounted to an additional twenty to twenty-five minutes in commuting time.

over an hour to drive. Walker wrote that "in view of * * * [Ms. McAllister's] considerably shorter distance (twenty-one miles) and lesser driving time (forty minutes) * * the latter two cases cannot serve as precedent for a decision favorable to Mrs. McAllister." While it is true that people with longer commutes may and did obtain PCS orders, this particular piece of evidence still fails to establish that Dander's decision was wrong. Defendant has shown no instance in which someone with a longer commute than plaintiff's was denied PCS orders. Such an instance might have suggested that Dander's decision was inconsistent with prior decisions of other CPOs. That others with more difficult commutes than plaintiff's received PCS orders, however, proves nothing.

To the extent that defendant is arguing that plaintiff's new commute is comparable to Wilson's and Palmer's old commutes and thus fails to establish the fourth criterion of C4108, the argument is unpersuasive for defendant has not shown that Wilson and Palmer applied for new PCS orders under their old commuting conditions or that if they had applied their requests would have been denied.

Walker also never mentioned that his reversal of CPO Dander was based on a consideration of factors such as plaintiff's increase in commuting time from her old residence to her old duty station compared to her old residence to her new duty station, some twenty-five minutes, and her new commuting time of only five minutes from the proposed new residence. These were factors that the regulations specifically required CPO Dander to consider and ones that Walker should have reviewed in reversing Dander's decision. However, Walker's testimony failed to show that Dander had not taken the above factors into consideration in reaching his decision or that he had incorrectly applied them.

Further, Walker testified that he considered High Wycombe and Marlow to be in the West Ruislip commuting area as an apparent justification for the revocation. This argument ignores the regulation itself, which is designed to provide allowances where the change in duty station is *within the same city or area.* Indeed, the second sentence of the second paragraph of JTR C4108 contemplates circumstances in which the increase in commuting distance is less than ten miles.

In sum, Walker's conclusion that the award was not appropriate is despite the facts, found by the grievance examiner, that: (1) Dander was acting within his authority; (2) plaintiff met all the objective criteria set forth in JTR C4108; (3) no specific guidance or "magic number of miles" dictated when PCS orders should be issued; (4) the regulation "hedged" and gave the travel authorizing official "discretionary leeway" in making such decisions; and (5) an additional twenty-five minutes was added to plaintiff's commute as a result of the reassignment. Furthermore, no cases were introduced at the hearing that were inconsistent with Dander's decision. Walker testified that his decision was primarily based upon his own judgment, a "good, in faith decision" on his part and that this was "basically the reason why" he reversed Dander's decision. Notwithstanding the fact that Walker may have acted in good faith, the record fails to reflect any valid reasons which would justify a finding of error on Dander's part.

In short, it appears that the sole basis for the reversal of the determination of eligibility was that the agency decided to change its official mind after the award of the PCS orders and LQA, based on the judgment of a person other than the one authorized to make such decisions. Defendant has alleged error on Dander's part but has shown no error. No additional facts came to Walker's attention to cast doubt on Dander's decision, nor was Dander shown to have misapplied or misinterpreted any policy. Such an *ad hoc* decision as this cannot be seen as an interpretation of policy deserving judicial deference. It provides no guidance whatsoever as to the meaning of this regulation.

Thus, while the agency may have shown that a *de novo* determination of plaintiff's

# 403

eligibility could reasonably produce a finding of noneligibility, there has been no showing that the decision made by Dander, as acting CPO, was erroneous.[8] That is the agency decision that is contested.

In the absence of evidence showing error on the part of the authorized agency official who properly determined plaintiff's eligibility in the first instance, defendant cannot prevail. Plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The Secretary of Defense is ordered to correct plaintiff's records to conform to CPO Dander's initial allowance of PCS orders and the LQA. Further proceedings pursuant to RUSCC 42C shall be had to determine the amount of plaintiff's recovery.

---

8. The result reached in this opinion is in no way meant to reflect upon the merits of the LQA program nor to discourage CPO's from strictly requiring compliance with both the letter and the spirit of JTR C4108 when granting benefits under that program. This court intends, however, to hold governmental agencies to existing legal standards when reversing their previous final decisions.