Joel O. BENTLEY

v.

The UNITED STATES.

No. 560–81C.

United States Claims Court.

Sept. 19, 1983.

Paul A. Kiefer, of Kiefer & Morrison, Washington, D.C., for plaintiff.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

---

## OPINION

COLAIANNI, Judge.

Joel Bentley is a civilian school teacher working for the Department of Defense Dependent School (DODDS) system in England. At issue in this case is Mr. Bentley's eligibility for a Living Quarters Allowance (LQA) under the Defense Department Overseas Teachers Pay and Personnel Practices Act.[1] The government initially granted plaintiff the LQA but subsequently reversed that decision after determining that it was granted in error. Plaintiff filed a grievance to protest the LQA revocation and a hearing was held. The issue examined at the hearing was whether the revocation was proper. The hearing examiner found that it was and recommended that the decision be upheld. The military commander who reviewed the case issued a final decision denying the grievance. Plaintiff then filed suit in this court, maintaining that the initial decision that the new LQA should be granted was a proper one. He seeks the LQA that initially was authorized.

This opinion must be read in conjunction with that of *McAllister v. United States,* 3 Cl.Ct. 394, decided this day. In many respects, this case presents issues virtually identical to those in *McAllister.* The same attorney represented the plaintiff in both cases while the same attorney from the Department of Justice argued for the government. In addition, the acting Civilian Personnel Officer (CPO), who initially approved the grant of benefits, was the same in both cases. Therefore, to avoid extended repetitious passages, *McAllister* is incorporated into this opinion.

This case is before the court on cross-motions for summary judgment pursuant to RUSCC 56. The parties are in agreement on all facts necessary to a resolution of the case. Upon a review of the motions presented, along with the supporting documents and following oral argument of counsel, it is concluded that defendant improperly reversed its initial decision that plaintiff was entitled to a new LQA. Therefore, plaintiff's motion for summary judgment is allowed and defendant's cross-motion for summary judgment is denied.

The sequence of events giving rise to plaintiff's claim is as follows.

### Facts

In 1978, plaintiff was teaching at a high school in Croughton, England, while living in North Oxford. At that time, plaintiff's handicapped son was attending school in Chinnor, at least one hour by car from his father's duty station. Plaintiff had purchased his North Oxford home with the aid of LQA payments. The ten-year limit for that purchase expired at the end of October 1979.

Plaintiff's son attended the Chinnor school as a result of DODDS's policy that handicapped children of employees be "mainstreamed."[2] In conjunction with this program, sponsors of handicapped children were to be assigned to duty stations that accommodated handicapped dependents. If sponsors were not properly assigned initially, reassignments were to be considered.

A vacancy became available at London Central High School in High Wycombe, which was considerably closer to plaintiff's son's school. Plaintiff filed a grievance when he was not transferred, and the Superintendent of Schools determined that his reassignment to the closer school was appropriate. The Superintendent agreed to reassign Bentley when the next vacancy occurred. In September 1979, Bentley received his transfer.

Plaintiff's commute from his home in North Oxford to the London Central High School at High Wycombe took fifty to fifty-

---

1. Act of July 17, 1959, Pub.L. No. 86–91, §§ 7–8, 73 Stat. 213, 216 (codified as amended at 20 U.S.C. §§ 905–906 (1976)).

2. On April 20, 1978, DODDS-Europe issued "Policy Statement on Mainstreaming" to implement the Education for All Handicapped Children Act of 1975, Pub.L. No. 94–142, 89 Stat. 773 (codified as amended at 20 U.S.C. §§ 1401 *et seq.* (1978)). That policy statement discussed, in part, the proper assignment of sponsors of handicapped children.

five minutes. As a result, he arranged to purchase a home in Knights Templar Way, approximately two-tenths mile from his new duty station. Mr. Bentley applied for a new LQA and, prior to this planned purchase, was told that he would receive it.[3] The individual authorized to determine eligibility at that time was Jeffrey M. Dander. On November 14, 1979, Dander approved the LQA renewal, retroactive to November 2, 1979. Through no fault of plaintiff's, the purchase of the home on Knights Templar Way fell through and he was forced to purchase a home in Headington, Oxfordshire, some five miles from his previous home. Notwithstanding this fact, he remained, according to the travel regulations in force at the time, eligible for the LQA.

Approximately eleven months later, in a letter dated October 10, 1980, Dander informed plaintiff that the LQA payments were being terminated. He characterized as error the initial decision of award, but did not state his reason. Bentley filed a grievance protesting this determination, and the grievance hearing was held on April 6, 1981. Mr. Bentley testified to the events that led to his grievance, particularly the circumstances surrounding his reassignment and his unsuccessful efforts during September and October 1979 to buy a house on Knights Templar Way. He also testified that prior to the time that his purchase of the home on Knights Templar Way fell through he had confirmed the sale of his old residence at North Oxford. Plaintiff thereafter purchased a home at Headington.

Dander, the government's representative, chose not to present testimonial evidence but instead to rely on the written record. Dander stated, "The guidance that we received from higher headquarters and interpretation of the regulations, precludes the granting of a new ten-year limit in this particular case. The guidance is fairly clear and the government bases this denial upon that."

In his final report, the hearing examiner found the distance between plaintiff's old and new permanent duty stations to be forty miles. Before he was reassigned, plaintiff had a nineteen and one-half mile, thirty-five- to forty-minute commute between his old house and old duty station. The commute between his old house and new duty station was thirty and one-half miles and took fifty to fifty-five minutes to drive. After his move, plaintiff had a twenty-four and six-tenths mile, twenty-five- to thirty-minute commute. Plaintiff moved some six miles closer to the new duty station, a change that cut approximately twenty-five minutes off his commute each way.

### Discussion

As in *McAllister*, the regulation at issue is Joint Travel Regulation (JTR) C4108.[4]

---

3. Whether Bentley also received permanent change of station (PCS) orders when transferred to High Wycombe is not clear. The record, particularly through correspondence transmitted from September through November 1980 between the CPO and Headquarters, United States Air Force (HQ USAF) indicates that PCS orders were never issued. Defendant asserts, however, that they were. In any event, the LQA is not dependent on PCS orders. HQ USAF so advised the CPO in a November 1980 response to a query directly addressing this issue.

4. That regulation provides:
"C4108 CHANGE OF STATION WITHIN SAME CITY OR AREA
"Travel, transportation, and other related allowances, as applicable, will be authorized incident to a permanent change of station even though the old and new permanent duty stations are located within the same city or area provided that the transfer:
—1. is in the interest of the Government,
—2. is to a new permanent duty station which is at least 10 miles distant from the old permanent duty station,
—3. is not primarily for the convenience or benefit of the employee or at his request,
—4. relocation of the residence is incident to the transfer.
"In determining that the relocation of the residence is incident to the transfer, the travel-approving official should take into consideration such factors as commuting time and distance between the employee's residence at the time of notification of the transfer and his old and new duty stations as well as the commuting time and distance between a proposed new residence and the new duty station. Ordinarily, a relocation of residence should not be considered as incident to a permanent change of

The government does not claim that Mr. Bentley failed to meet the first three of the regulation's four criteria. For purposes of this court's review, the government has conceded that those three criteria were met. In addition, the government agrees that Bentley met the only objective consideration listed in the second paragraph of JTR C4108 explaining criterion four, that the distance from his old residence to his new duty station, thirty and one-half miles, be at least ten miles greater than from his old residence to his old duty station, nineteen and one-half miles. The government does argue, however, that plaintiff failed to meet criterion four because Mr. Dander's initial finding that plaintiff's post-transfer commute was unreasonable was in error, and thus "plaintiff's relocation was not incident to his transfer." But defendant has presented little, if any, evidence to support its contention that Dander's initial finding was incorrect.

■ As a general rule, barring a showing of error, an agency may reconsider a final decision only if it does so reasonably soon after that decision and before the affected parties have changed their positions in reliance on it. *See McAllister v. United States,* at 398, and cases cited therein. In the present case, Mr. Dander approved Mr. Bentley's request for an LQA with full knowledge that Mr. Bentley would act on his decision. Upon receiving notice of the award, Mr. Bentley sold his home in North Oxford and bought a new home in Oxfordshire. Eleven months later, Mr. Dander revoked the award. The time lapse between the decision of award and the reversal was clearly unreasonable, and the reconsideration was therefore untimely.[5] Even if the time lapse had not been so great,

however, Mr. Bentley's change of position with the agency's knowledge and approval would bar reconsideration in this case. Therefore, in order to affirm the agency's revocation of the LQA, this court must find some error in Dander's initial decision of award.

The issue which defendant urges is before the court, and the one the hearing examiner actually decided, is whether it was reasonable to conclude that plaintiff was substantively ineligible for the LQA. The issue as framed by defendant completely ignores the fact that an authorized representative of the agency, acting within the scope of his authority, reached an opposite conclusion. The court believes, therefore, that the focus of this review, as in *McAllister,* must be on the propriety of the agency reversal of that original decision.

■ A presumption of regularity attaches to the actions of administrative officials. *See McAllister v. United States,* at 399, and cases cited therein. Mr. Dander was authorized to grant Mr. Bentley the LQA, and it must be presumed that his initial decision to do so was made in good faith and in full compliance with all applicable regulations. Defendant has offered no evidence to rebut this presumption.

■ The court agrees with defendant that the government must be able to correct the errors of its agents when entitlements are involved. However, defendant must do more than merely allege that a mistake occurred, and in this instance it has not established that any error was made when Dander approved the LQA under his initial decision. Defendant has simply alleged error and asserted that a different conclusion was reasonable. To support its position, it has pointed to no factual mis-

station unless the one-way commuting distance from the old residence to the new duty station is at least 10 miles greater than from the old residence to the old duty station. Even then, circumstances surrounding a particular case, for example, relative commuting time, may suggest that the relocation of residence was not incident to the transfer."

**5.** In *Biddle v. United States,* the government delayed eleven months between a decision and

its reconsideration. *See* 186 Ct.Cl. 87, 100 (1968). The court suggested that such a delay made the reconsideration "unreasonably out of time," but determined that the final decision favorable to the plaintiff was not invalid. *Id.* at 102. The court noted, "The defendant should not now be heard to assert the improper prolongation of the case by proceedings it instigated itself." *Id.* at 101.

take, misinterpretation of policy, or misapplication of regulation by Dander in making his initial decision. Nor has it shown that Mr. Dander acted outside the scope of his authority in granting the LQA. Such allegations without more are not sufficient to justify the revocation of the LQA once granted.

█ A careful reading of the regulations at issue indicates thatforth the minimum criteria necessary for LQA eligibility. It is thus clear that considerable latitude in determining eligibility was left to the judgment of the acting CPO, Mr. Dander. Dander had independent authority to make LQA decisions. There was no procedure to review his decision before it was communicated to the applicant. When all objective criteria are met and the final decision is to be solely a matter of judgment, as it was here, then the subsequent reversal of that decision without any showing of error cannot be sanctioned.

Defendant's reliance on the record for support of the reversal is misplaced inasmuch as the premises upon which its denial was initially based have turned out to be either wrong or no longer contested. To begin, Dander's letter of October 10, 1980, informing Bentley of the termination, referred to a HQ USAF determination in support of the finding of error. Attached to the letter were a query from Dander's office to headquarters of September 1980 and an October 1980 response, on which he apparently relied. The query stated as a premise that plaintiff's reassignment was at his request. The government has withdrawn this argument as a reason for Bentley's failure to qualify under JTR C4108.

The query also mentioned some guidance previously received which said that an employee could only get a new ten-year limit if he moved to the vicinity of the new permanent duty station (PDS). The query asked for clarification of the meaning of "vicinity of the new PDS." In response, headquarters stated that "vicinity" usually meant "within the local commuting area" and that entitlement to a new LQA was based on the employee's being transferred to another post in a different geographical area and normally required the issuance of PCS orders.

As to the interpretation of the meaning of "vicinity," it appears that the government no longer considers this an issue either. At first, defendant apparently was arguing that Croughton and High Wycombe, plaintiff's old and new places of employ, were in different commuting areas. Therefore, plaintiff was excluded from the coverage of JTR C4108, which is meant to encompass moves within the same city or area.

Defendant's current contention, however, is that Bentley was well within reasonable commuting distance to his new duty station from his house in North Oxford, and therefore the initial grant of the LQA was erroneous because Bentley's relocation of residence could not have been "incident to the transfer."

The headquarters' response concluded that the situation described did not meet the criteria needed for the renewal, and this was the guidance apparently used by Dander to reverse his initial decision. However, to reiterate, the government no longer relies on the argument that Bentley requested the reassignment. Nor does it maintain that JTR C4108 does not apply to a transfer of duty station from Croughton to High Wycombe. Thus, whatever guidance was received based on these premises cannot support the conclusion that Dander erred in his first decision.

One other factual error present in the record is defendant's contention that Mr. Bentley sold his old home subsequent to learning that the arrangement to purchase the home in Knights Templar Way had fallen through. This contention proved to be wrong. In addition, a December 1980 communication from headquarters advised that plaintiff's forced purchase of the alternative home in Oxfordshire would not in itself have justified denying him a new LQA.

Accordingly, the only issue relevant to the dispute as presently framed, and the

only matter raised at argument, was expressed in finding "f" of the grievance report, as follows: "the travel times and distances indicated from the old residence to the new duty station are not excessive and or [sic] in fact common to the area. (Ex. 2.) Therefore, the move is not considered incident to the transfer." Unfortunately, the evidence relied on by defendant in support of this argument is inconclusive or mistaken and cannot validate defendant's reversal of its initial grant of the LQA.[6]

In his comments on this point, the hearing examiner noted, "Management argues that the move was unnecessary because in October 1980 grievant presented evidence to indicate he was among those with the shortest distance to work (before the move)." The exact paragraph of Mr. Bentley's memorandum in which he makes this statement to Dander is as follows:

> It must be pointed out that Headington is located on the A–40/M–40 and is 25 or 30 minutes from my classroom assignment. Of the large staff at the school I am among those with the shortest drive to school. Two of my fellow-teachers live in London where the driving time is considerably longer than that of my own * * *. Therefore, I must emphasize that I am reasonably close to my actual duty station.

The hearing examiner, management, or both misinterpreted Mr. Bentley's statement referring to the length of his commute and to the extent they used that misinterpretation to justify revoking the LQA they are incorrect. The record clearly indicates that Mr. Bentley was discussing his commute after his move. In the first place, he refers to the drive from Headington, the location of his new residence. Second, his memorandum is in the present tense and is dated October 1980, which was after his move. Finally, there is no showing that plaintiff's thirty and one-half mile and fifty to fifty-five minute commute from his old residence to his new duty sta-

tion was among the shortest. Thus, the misinterpretation by the Hearing Examiner of Mr. Bentley's comment that he had one of the shortest commutes cannot support defendant's conclusion that Dander's initial decision granting the LQA was mistaken.

Other evidence in the record that was relied on to approve the revocation of Mr. Bentley's LQA relates to the commuting times of Messrs. Wilson and Palmer. The record specifically identifies these individuals as having received PCS orders when their commutes after reassignment from their old residences to their new duty stations took over an hour. These cases are certainly no more inconsistent with allowing plaintiff an LQA renewal than they are with the similar allowance in *McAllister. See McAllister v. United States,* at 402. Had PCS orders been denied Wilson and Palmer, their cases may have had some relevance in reviewing a denial based on a shorter commuting distance. But nothing suggests that those cases determine the threshold for approving an LQA. In a communication dated November 1980, headquarters explained the purpose of criterion four as follows:

> The intent of this is that the distance from the old residence to the new duty station is so great that the employee cannot reasonably be expected to commute daily between the two points: or, within the U.K., one could move from one duty location to another which is not excessively far away in terms of miles, but where the road system is such that significantly more time is required to commute to the new location from the old residence, thereby making a change of residence reasonable.

Criterion four leaves to the CPO the decision of what constitutes a "reasonable" commute.

Government counsel repeatedly asserted in argument that a mistake had been made and that the government must be able to correct its agents' mistakes. The court on

6. The argument fails for the more fundamental reason that defendant has not shown that the relative commuting times of others were not

considered by Mr. Dander in arriving at his initial decision.

several occasions pressed counsel to explain where the mistake lay. Counsel could only respond that "[w]hen the agency reviewed the decision they determined that by applying these regulations to this fact pattern the fact pattern did not meet the criteria in the regulations." Counsel further stated:

> [A]dmittedly we only have the Hearing Examiner's report, we do not have a written statement of why Dander was in error. We would only be guessing as to why he was in error. I would only be guessing. Anybody would. The question is whether or not there was substantial evidence to support the Hearing Examiner's situation.

Dander was available at the grievance hearing to explain why he made the decisions he made. In fact, Dander was management's representative at the hearing. To justify his reversal, he presented considerable amounts of evidence relevant to matters no longer at issue. Most of what he presented was guidance received after his reversal, which could have played no part in that decision.

The record put forth at the grievance hearing to justify the termination thus included erroneous or now undisputed issues. The arguments raised by defendant cannot be found in that record but appear to be *post hoc* rationalizations of the revocation. They were asserted only after other reasons for reversing the initial decision of eligibility failed.

It appears that the sole basis for the reversal of the determination of eligibility was that the agency decided to change its official mind after the award of the LQA. Defendant has alleged error on Dander's part in reaching his first decision but has shown no error. No additional facts came to Dander's attention to cast doubt on that decision, nor was he shown to have misapplied or misinterpreted any policy. Defendant has provided no evidence of a substantial nature that can support its decision to reverse.

Thus, while the agency may have shown that a *de novo* determination of plaintiff's eligibility could reasonably produce a finding of noneligibility, there has been no showing that the decision made by Dander, as acting CPO, was erroneous. That is the agency decision that is contested.

In the absence of evidence showing error on the part of the authorized agency official who properly determined plaintiff's eligibility in the first instance, defendant cannot prevail. Plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The Secretary of Defense is ordered to correct plaintiff's records to conform to CPO Dander's initial allowance of the LQA. Further proceedings pursuant to RUSCC 42(c) shall be had to determine the amount of plaintiff's recovery.