**BELVILLE MINING CO., INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

No. C–1–89–874.

United States District Court, S.D. Ohio, W.D.

April 30, 1991.

Robert Anderson, Ironton, Ohio, for plaintiffs.

Jan Holtzman, Asst. U.S. Atty., Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

### I. INTRODUCTION

This matter concerns a dispute between the Plaintiffs, which hold mineral rights in certain land located in Wayne National Forest, and the United States, which owns the surface rights in the same property. It essentially involves that portion of the Fifth Amendment to the United States Constitution which requires that compensation be paid for private property taken for public use.

Trial was held on March 27 and 28 and April 1 and 2, 1991. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court submits its Findings of Fact, Opinion and Conclusions of Law.

The determination of the issues herein involve detailed discussion and will follow the following outline:

INDEX

I. INTRODUCTION

II. FINDINGS OF FACT
  A. *General*
    1–7
  B. *Rights Created by Constitution and Judicial Decision*
    1. Constitution of the United States
    2. Constitution of the State of Ohio
    3. Judicial Decisions
  C. *Rights Created by Deed*
    1. Bauer Tract Findings a.–g.
    2. Culbertson Tract Findings a.–d.
    3. Jenkins Tract Findings a.–e.
    4. Simmering Tract Findings a.–e.
    5. Summary
  D. *Rights Granted by the United States*

III. OPINION
  A. *Rights Created by Constitution and Judicial Decision*
  B. *Rights Granted by the United States*

IV. CONCLUSIONS OF LAW
  A.–L.

### II. FINDINGS OF FACT

#### A. *General*

1. Wayne National Forest is located in the southeastern quarter of Ohio. It is composed of approximately 188,000 acres of land. Wayne National Forest is neither one contiguous entity, nor do all portions of it adjoin. There are substantial private holdings within it completely surrounded by land owned by the United States. Not all of the Forest is held in fee simple. Private mineral rights are retained in some areas. There is a distinction between National Parks created by 16 U.S.C. §§ 21, *et seq.*, and National Forests created by 16 U.S.C. §§ 515, *et seq.* The restrictions that relate to National Parks do not necessarily relate to National Forests.

2. Plaintiff Belville Mining is a private corporation engaged in the extraction of coal primarily in southeastern Ohio. It claims a right to remove coal from four tracts of land on which it or the individual Plaintiffs hold title to the mineral rights. The tracts of land are described variously

as the Bauer tract of approximately 188 acres; the Culbertson tract of approximately 5700 acres; the Jenkins tract of approximately 115 acres; and the Simmering tract of approximately 1700 acres.

The surface rights to all such tracts are held by the United States as part of Wayne National Forest.

3. Coal occurs in seams of varying widths and may be extracted in a number of ways. It may be removed by the use of dynamite, hydraulic pressure or augers. Where the seams are close to the surface, the operation may be done by "strip mining." Where the seams are substantially below the surface, only "deep mining" is practical.

4. "Deep mining" is the traditional form of extracting coal and other minerals. Until 1948 it was the dominant method for coal extraction in Ohio (Deft.Ex. E). It involves the sinking of vertical shafts to the various coal seams and the use of horizontal tunnels through such seams. In instances where the terrain is hilly or mountainous, it may involve only horizontal shafts. Deep mining is labor intensive and dangerous. It requires the reinforcing of the roofs of horizontal shafts, pumping to remove water seepage, and protection against methane gas.

5. "Strip mining" is a less expensive method of extracting coal and it proceeds in the following sequence. Trees, vegetation and soil known as "overburden" lying atop the coal seams are removed. When the coal is exposed, it is extracted by the use of mechanical scoops or shovels and transported from the premises by truck.

Strip mining requires far fewer employees than deep mining and usually only the skills necessary to operate the scoops, bulldozers and trucks. The dangers of roof collapse, flooding and methane gas which are present in deep mining rarely exist in strip mining. By its very nature strip mining is aesthetically unattractive and destructive of forests, animal habitat and streams. Overburden may be many feet deep. In the early days of strip mining, overburden was allowed to remain on the surface in what were known as "spoil banks." Currently in Ohio, strip mining is controlled by the State. Operators are required to return the overburden within a short period and to plant and landscape in order that the surface not be permanently destroyed.

6. Coal in southeastern Ohio is of the bituminous variety. Seams of coal are numbered in a fashion whereby the higher the number, the greater the elevation. In the litigation at hand, the only pertinent references are to Seams 4 and 5. Seams are separated by various other materials including limestone and clay. Under Ohio law different mineral rights may be conveyed to different persons and the various seams of coal may be conveyed to different persons.

7. Strip mining in Ohio began in 1914. At that time, 141,446 tons were strip mined while 18,594,861 tons were mined by underground or deep mining.[1] From 1914, strip mining in Ohio increased until in 1936 it accounted for approximately 10% of the total production. The tonnage in 1936 for strip mining was 2,343,000; for deep mining it was 21,120,032 tons. By 1948 strip mining accounted for more than one-half of the total tonnage in Ohio. In that year, 20,082,202 tons were strip mined while 18,232,155 tons were deep mined. From that year forward, the tonnage of strip mining always has exceeded the tonnage from deep mining. By 1990 the numbers were 20,283,876 tons for strip mining, 12,868,223 tons for deep mining. (Deft.Ex. E)

It therefore may be assumed that in the matters before the Court dealing with deeds executed in and after 1936, the technique of strip mining was known and the language in such deeds therefore may be considered on that basis.

B. *Rights Created by Constitution and Judicial Decision*

1. Constitution of the United States

The Court will take judicial notice that the Fifth Amendment to the Constitution of

---

**1.** In *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 251, 313 N.E.2d 374 (1974), the Supreme Court of Ohio noted that strip mining was not known in Guernsey County until 1917.

the United States provides in part as follows:

No person shall ... be deprived of ... property without due process of law; nor shall private property be taken for public use without just compensation.

2. Constitution of the State of Ohio

The Court will take judicial notice that Article I, Section 19 of the Constitution of the State of Ohio provides in part as follows:

Private property shall ever be held inviolate but subservient to the public welfare ... In all other cases [other than time of war or other public exigency] where private property shall be taken for public use, a compensation therefore shall first be made in money.

3. Judicial Decisions

The Court will take judicial notice that decisions of the Supreme Court of Ohio state the law by syllabus and that all else contained in an opinion is dictum. In *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), the Court held in the second branch of the syllabus:

The right to strip mine for coal is not implicit in the ownership of a severed mineral estate.

In the third branch of the syllabus, the Court held:

A deed which severs a mineral estate from a surface estate and which conveys the right to use the surface incident to mining coal in language peculiarly applicable to deep mining techniques does not grant the right to remove coal by strip mining methods.

Neither *Skivolocki* nor any other case cited to the Court has held that strip mining is illegal per se in Ohio or that a right to remove coal by strip mining cannot be created by deed.

C. *Rights Created by Deed*

1. Bauer Tract Findings

a. The Bauer tract of 306.42 acres was conveyed by General Warranty Deed to the United States of America on March 27, 1942, Recorded in Deed Book 281, p. 134, Scioto County records. Reserved to the Grantor was the following:

The right to prospect for and mine by means other than hydraulic, which is prohibited, manufacture and remove coal, limestone, clays and shales of Ohio in upon and under said lands, excepting that limestone is not hereby reserved ... [in property] in Section 36, Township 4, Range 19, Ohio River Survey.

The reservation likewise contains the following:

This reservation shall be subject to and in accordance with the Rules and Regulations of the Secretary of Agriculture of the United States of America pertaining thereto dated January 23, 1937 ...

(Joint Ex. I–68).

b. Belville Mining Company acquired its interest in a Land Installment Contract, dated July 3, 1986, from Courtney McCoy, Delbert McCoy and Evelyn McCoy. This document is recorded in Deed Book 613, page 432, of the Scioto County, Ohio records. (Joint Ex. I–69).

c. The deed to the United States was corrected by a "Correction Deed," dated June 23, 1942, recorded in Deed Book 281, page 271, of the Scioto County, Ohio records. The stated purpose of the Correction Deed is as follows:

Whereas it is the desire of the parties, Grantor and Grantee, in said Deed and in this instrument to correct said error [incorrect Rules and Regulations of the Secretary of Agriculture] and establish the proper rules and regulations under which said reserve mineral rights may be operated.

The Deed likewise contains the following:

It is further agreed that all of the terms and conditions of said original Deed are to remain in full force and effect without alteration, subjection or change, other than that any and all operations had or conducted under or by virtue of said reservations shall be subject to and in accordance with the Rules and Regulations of the Secretary of Agriculture of the United States, the text of which Rules

and Regulations are attached to this Instrument and designated 'Exhibit A' hereof.

d. The terms of Exhibit A, as attached to the foregoing Deed, which are significant to the issue before the Court are the following:

1. Only so much of the surface of the land shall be used or disturbed as is necessary in the bona fide prospecting, mining, drilling, or manufacturing of the minerals ...

2. If the exercise of the rights herein reserved will result in *the stripping*, collapse or other damage to the land or any improvement thereon, the recorded owner of the reserved rights or his legally authorized representative shall, upon written notification by the Forest Supervisor, pay to the designated fiscal officer of the United States for deposit in a cooperative fund, the amount determined by the Forest Officer in charge of the area to be necessary to restore the land to a serviceable or safe condition

.   .   .   .   .

.   .   .   .   .

5. Nothing herein contained shall be construed to exempt the operator or the mining operation from any requirements of the laws of the state in which situated, nor from compliance with or conformity to any requirements of any law or regulation which later may be enacted or promulgated and which otherwise would be applicable (emphasis added).

(Joint Ex. I–70).

e. On February 16, 1989, by a "Limited Warranty Deed," recorded in Deed Book 816, p. 198, Scioto County records, Courtney McCoy, Delbert McCoy and Evelyn McCoy conveyed their interest in the premises in question to Belville Mining Company. The parties have stipulated that on February 16, 1989, Plaintiff Belville obtained the reserved mineral rights to the Bauer property. (Final Pretrial Order, Section V. A.1.).

f. In its acquisition of the Bauer property, the United States reduced its purchase price because of the mineral reservation.

The amount of such reduction is stated to be 30% in Joint Exhibit I–178. It is calculated at 50.4% in Plaintiffs' Exhibit 59. Despite the difference in percentages, there is no dispute that the United States paid less for the real estate than it would have paid for a fee simple title.

g. The mineral rights reservation acquired by the Plaintiffs as above set forth permits strip mining on the Bauer tract.

2. Culbertson Tract Findings

a. The Culbertson tract consists of 5,763.14 acres, acquired by the United States on February 26, 1936. The conveyance is represented by two separate deeds, one for 2348.80 acres, recorded in Deed Book 147, p. 346, of the Lawrence County, Ohio records, and the other containing 3414.34 acres, recorded in Deed Book 147, p. 350, of the Lawrence County, Ohio records. Each transfer is by General Warranty Deed and each contains the following reservation:

... Reserving to the Grantor, his Executors, Heirs, Administrators and Assigns, the right to prospect for, mine, remove and/or produce coal ... for a period of ninety-nine years, after which all right, interest and ownership of said reservation will be vested in the United States, ....

Each deed also contains the following language:

1. Any person claiming the right to prospect, search for, mine, drill, remove, develop or operate in, under, or upon lands acquired by the United States under provisions of the Act of March 1, 1911, with a reservation of mineral rights to the Grantor, must on demand exhibit to the Forest Officer in Charge satisfactory written evidence to show his right or authority from, through or under said Grantor.

2. In prospecting for and in mining or removing said coal ... and in manufacturing the products thereof, only so much of the surface as is reasonably necessary for the purpose shall be used.

3. In new development work and operations all reasonable and usual precau-

tions required by the General Mining Laws for the support of the surface will be made and to this end tunnels, shafts and other workings will be subject to inspection by the Forest Officer in Charge and by mine inspectors of the United States.

(Joint Exs. I–88, 89).

b. Plaintiff Belville Mining Company claims its interest in the reservation by Deed recorded in Vol. 510, p. 589, of the Lawrence County, Ohio records. This document is in the form of a General Warranty Deed and conveys to the Belville Mining Company, its successors and assigns, the coal rights reserved in Deed Book 147, p. 350, in land in a 522.64 acre tract and in a 94.58 acre tract. It should be noted that the last line of the legal description states:

> ... to the place of beginning and containing 647.22 acres more or less.

Adding the acreage of both tracts, however, will bring a total of only 617.22 acres. (Joint Ex. I–91).

c. Plaintiff likewise claims under an Option Agreement recorded in June, 1988, in Deed Book 444, p. 487, of the records of Lawrence County, Ohio, and the document contains the following language:

> The land contract shall further provide that optionors warrant that they are the true and lawful owners of the coal rights, interests being sold hereunder as such interest was reserved in the Deed of E.S. and Alice C. Culbertson to the United States of America dated February 26, 1936 and recorded in Deed Volume 147, p. 346, Lawrence County Recorder's Office and as reserved in the Deed of E.S. and Alice C. Culbertson to the United States of America dated February 26, 1936, and recorded in Deed Volume 147, p. 350, Lawrence County, Ohio, records.

(Joint Ex. I–92).

d. The language in the reservation of coal rights does not appear to contemplate strip mining. The descriptive language is as follows:

> ... all reasonable and usual precautions required by the General Mining Laws *for the support of the surface will be made and to this end tunnels, shafts and*

*other workings will be subject to inspections* (emphasis added).

The technique of strip mining does not require support for the surface and does not involve the construction of tunnels, shafts and other workings. Only deep mining would involve such activities.

The mineral rights reservation acquired by the Plaintiff as above set forth does not permit strip mining on the Culbertson tracts.

3. Jenkins Tract Findings

a. The United States acquired its interest in the Jenkins Tract by Deed dated March 29, 1950. Since the deed covered land in both Lawrence and Jackson Counties, the deed was recorded in Deed Book 198, p. 221, of the Lawrence County, Ohio records, and in Deed Book 137, p. 637, of the Jackson County records. The Deed contains the following language:

> The total acreage being conveyed hereby being 115 acres, more or less. Reserving unto the Grantors herein, their Heirs, Administrators and Executors and Assigns, until the termination of December 31, 1989, the right to take and remove coal ... deposited in or under the above-described land, with full right to the Grantors herein, their Lessees, Successors and Assigns, at any and all times to enter upon said land and to take and remove said coal ... found therein or thereon, provided however that any and all operations which may be had or conducted under or by virtue of this reservation shall be subject to and in accordance with the Rules and Regulations of the Secretary of Agriculture of the United States of America pertaining thereto dated July 3, 1947....

(Joint Ex. I–62). Since the Plaintiff sought and received from Defendant a determination prior to December 31, 1989 that it possessed "valid existing rights" (VER), the reservation will be deemed to be in full force and effect at this time.

b. Among the restrictions provided by the United States and stated to be "pursuant to the provisions of the Act of March 1,

1911, as amended, particularly by the Act of March 4, 1913 and the Acts of March 20, 1922," the following appears:

> If exercise of the reserved rights results in stripping, collapse or other damage to the land or to improvements thereon, the record owner of the reserved rights or the successor, assigns or lessees thereof shall repair or replace the improvements damaged or destroyed and/or restore the land to a condition safe and reasonably serviceable for usual National Forest purposes....

c. The Plaintiff Belville Mining Company claims its right to the Lawrence County property by Deed recorded in Volume 327, p. 88, and dated November 16, 1966. The Deed states:

> All of the Grantor's rights in and to coal ... and minerals lying in or under ... as reserved in the Deed of the within named Grantors to the United States of America which Deed is recorded in the Office of the Recorder of Lawrence County, Ohio, in Deed Record Volume 198, p. 221.

(Joint Ex. I-63).

d. In acquiring the Jenkins property, the United States discounted the purchase price by 18%. (Joint Ex. I-30). The discount is stated to be "less discount at 8% for forty year mineral reservation; less discount at 10% for outstanding mineral rights." The reduction from appraisal as determined in Plaintiff's Exhibit 58 is 33%. Despite the difference in percentages, it is clear that the United States made some reduction for the mineral deposits it did not buy.

e. The Rules and Regulations of the Department of Agriculture set forth in the Deed indicate an intention of the parties to permit strip mining. The critical language is as follows:

> If the exercise of the rights herein reserved will result in the *stripping*, collapse or other damage to the land or any improvement thereon, the recorded owner of the reserved rights ... shall repair or replace the improvements (emphasis added).

The obligation upon the holder of the reserved rights to make some form of compensation or replacement is a clear indication that the parties contemplated that such activities were not prohibited. The mineral rights reservation as above set forth permits strip mining on the Jenkins tract.

4. Simmering Tract Findings

a. The Simmering property was conveyed to the United States by General Warranty Deed dated March 15, 1943, and recorded in Deed Book 168, p. 180, of the records of Lawrence County, Ohio. Reserved from the conveyance in such Deed is the following:

> Reserving, however, unto the Grantors herein, their Heirs, Executors, Administrators and Assigns, for the period ending December 31, 2039, the right to prospect for and mine by means other than hydraulic, which is prohibited, manufacture and remove coal ... in or upon said lands, provided, however, that any and all operations which may be had or conducted under or by virtue of this reservation shall be subject to and in accordance with the Rules and Regulations of the Secretary of Agriculture of the United States of America pertaining thereto dated January 23, 1937....

The above Deed was recorded on April 14, 1943, in Deed Book 281, p. 560, of the Scioto County records and on May 10, 1943 in Deed Book 168, p. 80, of the Lawrence County records.

b. The Plaintiff Belville Mining Company claims its rights under a "Warranty Deed" dated November 27, 1982, which states as follows:

> All coal and other minerals, oil and gas on the several tracts of real estate comprising 1551.12 acres, more or less, in Lawrence County, Ohio, and Scioto County, Ohio.

That Deed contains the following language:

> It is agreed and understood that this conveyance is made subject to the written reservation and retention by Plibrico Company, a former lessee of the fire clay and exposed and uncovered coal, in and under the aforementioned tract of real

property to continue to enter on said property for the purpose of reclaiming those areas previously mined by it or its agents as required to be reclaimed by the Ohio Department of Natural Resources Division of Reclamation. The above conveyance is recorded in Deed Book 757, p. 196, of the Deed of Records of Lawrence County, Ohio.

c. The critical language in the reservation in the Deed from the Simmerings to the United States is the following:

the right to prospect for and mine by means other than hydraulic, which is prohibited, manufacture and remove coal ... in or upon said lands, ....

d. In its acquisition of the Simmering property the United States reduced the purchase price by 20% for ninety-nine year mineral reservation. (Joint Ex. I–178). The Plaintiffs calculated that the total percent of reduction was 33.4%. (Pltf.Ex. 60). As before, the difference in percentage of reduction is far less significant than the fact that the United States reduced the purchase price because it did not include the mineral rights. Despite the difference in percentages, the Court finds that the United States did not purchase the mineral deposits.

e. Under the legal principle known as "Expressio Unius [2]," the exclusion of hydraulic methods for coal extraction must allow all other methods. The mineral rights reservation acquired by the Plaintiff as above set forth permits strip mining on the Simmering tract.

5. Summary

Therefore, in summary of the section on Rights Created by Deed, the Court finds that Plaintiff Belville Mining Company has a right granted by deed to strip mine on the Bauer, Jenkins and Simmering tracts. Plaintiffs have no right granted by deed to strip mine on the Culbertson tract.

D. *Rights Granted by the United States*

1. No entity may conduct strip mining operations in the state of Ohio without first obtaining the necessary permits from the Ohio Department of Natural Resources. (*See* Pltf.Ex. 50). Since sometime after August 3, 1977, the State of Ohio will not issue a permit for strip mining within the boundaries of any National Forest unless the federal Office of Surface Mining Reclamation and Enforcement ("OSM") previously has determined that the permit applicant possesses "valid existing rights" to strip mine on that property. *See* 30 U.S.C. § 1272(e).

2. On December 23, 1988, OSM issued a determination that Belville Mining possessed "valid existing rights" ("VER") to strip mine on the Bauer, Culbertson, Jenkins and Simmering properties. (Joint Ex. I–146). Belville then prepared and submitted to the State of Ohio an application for a permit to continue its mining operations onto some of the properties encompassed by that VER determination. (Pltf.Ex. 50).

3. On August 24, 1989, OSM notified Belville that it was suspending the prior positive VER determination, pending "full agency consideration of the VER question." (Joint Ex. I–143).

4. On December 15, 1989, OSM advised Belville that OSM had reversed its previous determination and now held that Belville did *not* possess valid existing rights to surface mine on the Culbertson property. (Joint Ex. I–137). As a result of that decision, Belville was unable to obtain permits to strip mine that property. In addition, Belville's mineral rights lease as to the Jenkins was to have expired on December 31, 1989, as provided by the leasehold terms. (Joint Ex. I–62). (*See* Finding of Fact 3.a.)

## III.  OPINION

A. *Rights Created by Constitution and Judicial Decision*

In considering the rights of Plaintiffs in this matter, it is advisable to examine the Fifth Amendment once again. Particularly pertinent to the matter at hand is

---

**2.** "Expressio Unius est exclusio alterius:" The

expression of one is the exclusion of all others.

the dual reference to property. The Fifth Amendment provides in part:

No person shall be deprived of property *without due process of law ...*

And:

Nor shall private property be taken for public use *without just compensation ...* (emphasis added).

The procedures utilized by the United States will be discussed in Section III.C. hereof. Those procedures require an examination of a *due process* consideration. Due process is separate and apart from that quoted sentence dealing specifically with a taking without just compensation. It is not disputed that the United States discounted the purchase price for the Bauer, Jenkins and Simmering tracts because it didn't acquire a fee simple title. Joint Exhibit I–178 and Plaintiffs' Exhibit 59 differ in the amount of percentage of reduction in purchase price in the Bauer tract. Joint Exhibit I–30 and Plaintiffs' Exhibit 58 deal with the Jenkins tract. Joint Exhibit I–178 and Plaintiffs' Exhibit 60 deal with the Simmering tract. In each instance there is a difference between the asserted amounts of reduction. (*See* Findings of Fact II C 1 f, II C 3 d, II C 4 d).

The disagreement over percentage of reduction is not controlling. The parties do agree that there was such a reduction. Whether or not the United States sought to buy a fee simple title is really not relevant. This litigation concerns the scarcely tenable position of the United States which did not pay for mineral rights at the time, but now seeks to assert control as though it did.

Uncontroverted testimony presented in this matter indicates that it is not economically feasible to remove the mineral deposits by deep mining. Instead, the United States' expert, Inhi Hong, took the position that the deposits could not be mined economically by any method. This hardly bears on the legal issue. Whether the owner makes or loses money in the effort is not a basis for denying a right to remove what has been purchased. The United States may be heard to say only that it owns the mineral rights, which clearly is incorrect. In the Bauer, Culbertson, Jenkins and Simmering tracts each, there has been overwhelming evidence of a separation of surface and mineral rights. The only question, however, as to the Culbertson tract, is whether the removal may be done by strip mining.

The United States has always had a remedy. It can prevent the removal of the coal deposits by strip mining by acquiring those deposits. Eminent domain always has been available, and the United States thereby can ensure that the mineral deposits will never be disturbed and the surface itself never changed. What the United States may not do in the face of the Fifth Amendment is what it currently seeks to do, namely to prevent the removal of minerals which it elected not to purchase from land which it did.

This can only be described as an acquisition of private property for public use without compensation.

The Constitution of Ohio states the same principle. Article I, Section 19 of the Constitution of the State of Ohio provides in part as follows:

Private property shall ever be held inviolate, but subservient to the public welfare ... In all other cases [other than time of war or other public exigency] where private property shall be taken for public use, *a compensation therefore shall first be made* in money (emphasis added).

It is beyond question that the right to extract minerals from the ground is a matter of property in Ohio and that the ownership of real estate may be divided between surface rights and mineral rights. To determine whether or not such property right exists, there must be a deed-by-deed examination.

The Supreme Court of Ohio has considered this issue in the case of *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974). The second branch of the syllabus in *Skivolocki* states:

The right to strip mine for coal is not implicit in the ownership of a severed mineral estate.

The third branch of the syllabus states:

A deed which severs a mineral estate from a surface estate and which conveys

the right to use the surface incident to mining coal in language peculiarly applicable to deep mining techniques does not grant the right to remove coal by strip mining methods.

There is language in the *Skivolocki* opinion which is instructive in the matter at hand. On page 251, 313 N.E.2d 374 of the opinion, the following statement is made:

> In sum then we hold that the right to strip mine is not incident to ownership of a mineral estate. Because strip mining is totally incompatible with the enjoyment of a surface estate, a heavy burden rests upon the party seeking to demonstrate that such a right exists. This is especially true when the deed relied upon was executed prior to the time strip mining techniques became widely employed.

In the *Skivolocki* case, the Supreme Court of Ohio found that the technique of strip mining was not known in Guernsey County until 1917. *Skivolocki* does not hold that all strip mining is prohibited. It dealt with deeds executed long before 1917. We deal with deeds executed long after.

It is in the context of the foregoing that the constitutional rights of the Plaintiffs must be considered. It is not a sufficient response to point out that strip mining is destructive, unaesthetic, unsightly and a threat to the current ecology of the area. Within the past decade or so, society's attention to ecological problems has been magnified as it appears that man may very well be making such fundamental changes to the surface and the atmosphere of this planet, that future living conditions may be materially affected. This requires then a balancing between the needs of society and the rights of a private property owner. As part of the balancing, strip mining has been strictly controlled and a requirement of reclamation and restoration in Ohio at least is a prerequisite to any strip mining enterprise.

May desirability be substituted for constitutional rights? The Constitution of the United States was never intended to be the exclusive property of the popular and orderly members of society. It may not be interpreted to suit the majority wishes at a given moment.

Evidence presented to the Court disclosed that as a result of strip mining a forest environment will be changed into a meadow environment for a substantial period of time. The Court will accept the position of Defendants' expert that over one hundred years will elapse before a forest is restored where a forest now exists. The question, however, is not whether a restoration of the forest is mandated, but whether the substitution of meadowland, with its different population of animals and vegetation, is enough to sustain private property rights.

Society's viewpoint on these matters has changed from time to time. In the early history of the United States, forests were destroyed because they were deemed "bad" and cultivated land was deemed "good." Large swamps which were considered evil were drained and filled. Today, they are known as "wetlands" and cherished. The fact that the environment will change and different species of animals and vegetation will occupy the area, is not necessarily a basis for denying constitutional rights. Meadow land will attract its animals and a new ecological food chain will replace forestland animals and their food chain. This choice may involve different value judgments, but such judgments may not destroy rights guaranteed by the Constitution of the United States.

Accordingly, the Court holds as a matter of principle that the right to strip mine where granted in appropriate terms is a private property right protected by the Constitutions of the United States and the State of Ohio and may not be taken from the owner without the payment of compensation.

B. *Rights Granted by the United States*

■ An administrative agency's reconsideration of what was presumed to be a final decision necessarily involves two competing interests—the desirability of finality versus the public interest in ensuring the correct result. *Civil Aeronautics Bd. v.*

*Delta Air Lines, Inc.*, 367 U.S. 316, 321, 81 S.Ct. 1611, 1616, 6 L.Ed.2d 869 (1961). The courts have been reluctant to permit agencies such as OSM to reconsider decisions already in effect unless statutory language specifically authorizes them to do so. *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1159 (6th Cir.1980) (citing *Delta Air Lines*, 367 U.S. at 321–22, 334, 81 S.Ct. at 1616–17, 1623). "[T]he determinative question is not what an agency created by Congress thinks it should do, but what Congress has said it can do." *Hall v. Secretary, Health, Educ. and Welfare*, 600 F.2d 556, 562 (6th Cir.1979) (citing *Delta Air Lines*, 367 U.S. at 322, 81 S.Ct. at 1617).

Even if not specified, the power to correct clerical mistakes may be implicit in the scope of an agency's authority. *See American Trucking Ass'ns, Inc. v. Frisco Transp. Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958). Indeed, the Court of Claims has recognized an agency's inherent power to reconsider any decision within a "reasonable time period," absent evidence of a contrary legislative intent. *Bookman v. United States*, 197 Ct.Cl. 108, 453 F.2d 1263, 1264–65 (1972). However, such reconsideration is not appropriate after the parties have changed their positions adversely in reliance on the agency's decision. *McAllister v. United States*, 3 Cl.Ct. 394, 398 (1983). *See also Faircrest Site Opposition Comm. v. Levi*, 418 F.Supp. 1099, 1105 (N.D.Ohio 1976). Moreover, "the power to correct inadvertent ministerial errors may not be used *as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies.*" *American Trucking*, 358 U.S. at 146, 79 S.Ct. at 177 (emphasis added).

As defendants correctly assert, the United States generally is not subject to the defense of estoppel. *Graves v. United States*, 833 F.2d 1012 (6th Cir.1987) (citing *Utah Power and Light Co. v. United States*, 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1916)). However, in arguing that the United States is not bound by what it alleges was an erroneous VER determination in December 1988, the government ignores the more relevant question of whether OSM was empowered to change its original VER determination regarding the subject tracts. *See Delta Air Lines*, 367 U.S. at 322, 81 S.Ct. at 1617.

The relevant portions of the Surface Mining Control and Reclamation Act ("SMCRA") neither specifically authorize OSM to reverse its VER determinations nor contain the type of "broad enabling statute" contemplated in *American Trucking*, 358 U.S. at 145, 79 S.Ct. at 177. *See* 30 U.S.C. §§ 1251–1279, 1291–1309. OSM therefore does not appear to possess the Congressional authority necessary to reverse its final decisions. *See Delta*, 367 U.S. 316, 81 S.Ct. 1611; *Marshall*, 615 F.2d at 1159.

Moreover, although Congress did not expressly withhold from OSM the authority to reconsider VER determinations, OSM's reversal of the Belville VER determination ventured beyond the limit of any inherent powers of reconsideration the agency may possess. *See American Trucking*, 358 U.S. at 145, 79 S.Ct. at 177; *Bookman*, 453 F.2d at 1264–65; *McAllister*, 3 Cl.Ct. at 398. Despite defendants' characterization of the December 1988 positive VER determination as a "mistake," the circumstances surrounding the reversal of that determination are more suggestive of policy change implementation than of administrative oversight correction. Defendants concede that an inquiry from a member of Congress instigated OSM's reconsideration of the Belville VER determination (*see* Joint Ex. I–173), and that the VER determination was suspended and reversed only after a new OSM director took office. (*See* Joint Ex. I–168). The reversal of the VER determination thus does not fall within any power of OSM to rectify its clerical errors. *See American Trucking*, 358 U.S. at 146, 79 S.Ct. at 177.

Additionally, the rules and regulations promulgated by OSM provide that failure to request a review of an OSM determination regarding the existence of VER within 30 days after notice of the determination constitutes waiver of the right to review. 43 C.F.R. §§ 4.1390–94. OSM did not noti-

fy Belville of its intent to suspend the positive VER determination until nearly eight months after that decision was issued. (Joint Ex. I–143). Irrespective of its actual Congressional authority to reconsider its decisions, OSM failed to comply with its own established procedures for reconsidering the Belville VER determination. OSM thus failed to act within a presumptively "reasonable" time after its December 1988 VER determination to reconsider its decision regarding the subject properties. *See Bookman*, 453 F.2d at 1264–65. In the interim, Belville adversely changed its position in reliance on the positive VER determination, by devoting considerable resources to the Ohio permit application process. (Plaintiff's Ex. 50). That detrimental reliance further constrains OSM's power to reconsider the December 1988 VER determination. *See McAllister*, 3 Cl.Ct. at 398.

## IV. CONCLUSIONS OF LAW

A. This Court has jurisdiction pursuant to 30 U.S.C. § 1276(a) and 28 U.S.C. §§ 1331, 1337, 1346, 1361, 2201 and 2202.

B. The right to compensation for the taking of private property is a constitutional one. Amendment V of the Constitution of the United States; Article I, Section 19 of the Constitution of the State of Ohio.

C. The right to strip mine in Ohio, while not implicit in the ownership of a severed mineral estate, is not prohibited. *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974).

D. The burden of establishing a right to strip mine is less difficult where the severance deed was executed after strip mining techniques became widely employed. *Skivolocki, supra* at 251, 313 N.E.2d 374.

E. The deeds of severance as to the Bauer, Jenkins and Simmering tracts created valid rights to strip mine. The deeds of severance for the Culbertson tract did not.

F. Where the United States purchases land at a discount because of reserved mineral rights, a denial by the United States of extraction of such minerals is a taking without compensation.

G. Where, as here, minerals can be extracted profitably only by strip mining, the denial of that method of extraction is a taking without compensation.

H. The reclamation of a strip mine which will substitute a meadowland environment for a forest environment is not sufficient grounds to bar extraction of minerals by strip mining.

I. Congress did not expressly authorize OSM to reconsider its VER determinations. 30 U.S.C. §§ 1201–1328.

J. OSM's attempts to suspend and later reverse the December 1988 positive VER determination exceeded the scope of any inherent power to reconsider its decisions, in that: 1) the reconsideration was motivated by an intervening policy change rather than by the discovery of a clerical error, *American Trucking Ass'ns, Inc. v. Frisco Transp. Co.*, 358 U.S. 133, 146, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958); 2) the reconsideration did not occur within the presumptively reasonable time period established for review of VER determinations, as set forth in 30 C.F.R. §§ 4.3190–94, *Bookman v. United States*, 197 Ct.Cl. 108, 453 F.2d 1263, 1264–65 (1972); and 3) the reconsideration did not occur until after Belville adversely changed its position in reliance on the December 1988 positive VER determination. *McAllister v. United States*, 3 Cl.Ct. 394, 398 (1983).

K. OSM lacked the power to reconsider its December 1988 positive VER determination regarding the subject properties in the manner in which that reconsideration was effected, and defendants therefore are bound by the December 1988 decision. *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321, 81 S.Ct. 1611, 1616, 6 L.Ed.2d 869 (1961); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1159 (6th Cir.1980) (citing *Delta Air Lines*, 367 U.S. at 321–22, 334, 81 S.Ct. at 1616–17, 1623); *Hall v. Secretary, Health, Educ. and Welfare*, 600 F.2d 556, 562 (6th Cir.1979) (citing *Delta Air Lines*, 367 U.S. at 322, 81 S.Ct. at 1617).

L. Where, as in the case of the Jenkins tract, a "VER" is granted before a lease expires and is later improperly withdrawn, the rights stated in that lease will be determined as of the date of original VER grant.

In accordance with the foregoing, a Declaratory Judgment should and hereby does issue finding that Plaintiffs possess valid existing rights to strip mine the tracts in issue and directing Defendants, their respective agents and employees, to issue forthwith all documentation required for Plaintiffs to obtain necessary permits in order that strip mining may proceed. Such mining shall be subject to the reclamation and restoration requirements of the State of Ohio.

IT IS SO ORDERED.