**BELVILLE MINING COMPANY, et al., Plaintiffs–Appellees, Cross–Appellants,**

v.

**UNITED STATES of America, et al., Defendants–Appellants, Cross–Appellees.**

Nos. 91–3623, 91–3651.

United States Court of Appeals, Sixth Circuit.

Argued May 8, 1992.

Decided July 26, 1993.

Robert Craig Anderson, Anderson & Anderson, Ironton, OH, Dean K. Hunt (argued and briefed), Stephens & Hunt, Lexington, KY, for plaintiffs-appellees cross-appellants.

Jan M. Holtzman, Asst. U.S. Atty., Cincinnati, OH, Martin W. Matzen (briefed), Evelyn S. Ying (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for defendants-appellants cross-appellees.

Before: KENNEDY, NELSON and BATCHELDER, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This case involves a dispute as to whether strip mining rights were reserved by certain Ohio landowners who conveyed four tracts of land to the federal government some years ago. In a decision reported at 763 F.Supp. 1411 (S.D.Ohio 1991), the district court determined that the grantors of three of the tracts

did reserve such rights and that the grantor of the fourth (a 5,763 acre tract known as the Culbertson property) did not. We find no error in these determinations. Contrary to a conclusion reached by the district court with respect to the Culbertson tract, however, we conclude that the Department of the Interior possessed authority to reconsider an administrative determination wherein the agency had erroneously recognized the existence of private strip mining rights in that tract. We shall therefore reverse the judgment of the district court insofar as it allowed private strip mining on the Culbertson tract. The judgment will be affirmed as to each of the other tracts.

## I

Under the authority of the Weeks Act of 1911, as amended, 16 U.S.C. §§ 515 et seq., the Secretary of Agriculture has purchased many thousands of acres of land in Southeastern Ohio's coal country for inclusion in the Wayne National Forest. In some of these purchases all mineral rights were included. In order to acquire more acreage for less money, however, the government often made purchases that were subject to a reservation of mineral rights by the grantor. (Land can cost significantly more with mineral rights than without, of course, if there is thought to be any possibility that the mineral rights might be exploitable.) Mineral rights of one sort or another were reserved by the grantors of each of the four tracts at issue here, and the plaintiffs (referred to collectively as "Belville") eventually acquired the reserved mineral rights pursuant to deed, land contract, and option agreement.

The first of the four tracts to be purchased was the largest: 5,763.14 acres of land in Lawrence County, Ohio, acquired under two deeds executed by E.S. Culbertson and Alice C. Culbertson, husband and wife, on February 26, 1936. The stated consideration totaled $26,697.27, or about $4.63 per acre. Both of the deeds contained provisions reserving to the Culbertsons "the right to prospect for, mine, remove and/or produce coal, oil, [and] gas for a period of 99 years...." Other provisions will be described in the next part of our opinion.

In 1942 the government purchased 306.42 acres of land in Scioto County, Ohio, from Edward W. Bauer and Clarice Bauer, his wife, at a stated price of approximately $6.25 per acre. The Bauers reserved for a 99 year period "the right to prospect for and mine by means other than hydraulic ... coal, limestone, clays and shales of Ohio...."

By deed dated March 15, 1943, Harmon and Anna Simmering and three couples named Taylor granted the government 1,630.74 acres of land in Scioto County, Ohio, in consideration of a stated price of $10.00 per acre. The deed contained a reservation of mineral rights similar to that in the Bauer deed.

In March of 1950, finally, a tract of 115 acres in Lawrence and Jackson Counties, Ohio, was granted to the government at a price of $11.00 per acre by Charles A. Jenkins and Beulah Jenkins, husband and wife. Subject to a right of renewal for five years, the grantors reserved "until the termination of December 31, 1989, the right to take and remove coal, clay, limestone, gas and oil...."

Strip mining for coal did not begin in Ohio until 1914, the district court found. By 1936, however—the year of the Culbertson conveyances—strip mining accounted for about 10 percent of Ohio's total production of coal. See 763 F.Supp. at 1413. Strip mining accounted for more than half the total coal production in Ohio by 1948. Id.

During the 1950s, the record indicates, strip mining operations were conducted on both the Bauer and Simmering tracts pursuant to permits issued by the United States Forest Service. Strip mining was conducted on the Jenkins tract, under Forest Service permit, during the 1960s.

Congress subsequently enacted the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328, a statute known by the acronym "SMCRA." Section 522(e) of SMCRA, 30 U.S.C. § 1272(e), provides that "[a]fter August 3, 1977, and subject to valid existing rights[,] no surface coal mining operations except those which exist on August 3, 1977, shall be permitted ... on any Federal lands within the boundaries of

any national forest...." (Emphasis supplied.)

The administrative body charged with responsibility for making determinations as to "valid existing rights" (known to the cognoscenti as "VER") is the Interior Department's Office of Surface Mining, Reclamation, and Enforcement ("OSM," for short). In September of 1985 plaintiff Belville applied for a determination that it possessed valid existing rights to conduct strip mining operations on the four tracts described above. OSM denied the application. Belville reapplied in August of 1988, submitting supplemental information. On December 23, 1988, OSM's Assistant Director for Eastern Field Operations signed a short letter in which he said it was his determination that Belville "possess[es] valid existing rights" in the four tracts. The letter, sent to Belville with a copy to the Ohio Division of Reclamation, went on to say that Belville could now seek state permits to mine the properties.

In June of 1989, while applications for state permits were pending, a Congressional subcommittee issued a report highly critical of this particular VER determination. Two months later, before the necessary strip mining permits had been issued by the State of Ohio, a newly appointed Director of OSM notified Belville that the VER determinations were being suspended. On December 15, 1989, OSM reversed its determination as to the Culbertson tract. Reversals as to the other three tracts followed some months later.

Belville filed the present action in February of 1990. The complaint sought declaratory and injunctive relief against the United States and various federal agencies and officials. The district court conducted a four-day bench trial in the spring of 1991, and the decision referred to at the outset of this opinion was issued soon thereafter.

The government perfected a timely appeal. Belville cross-appealed from the portion of the decision in which the district court found that the grantors of the Culbertson tract had not reserved (and Belville had not acquired by deed) the right to strip mine coal on that tract. On motion by the government we stayed the judgment pending resolution of the appeals.

II

The validity of Belville's assertion that a right to strip mine coal was included in its bundle of reserved rights must be determined under Ohio law. Most of the Ohio decisions relevant in this connection deal with conveyances made in an era when coal was extracted only through deep mining techniques, as opposed to surface mining techniques [1]—and it is helpful, in reading the caselaw, to bear in mind what mining techniques were in use when the conveyance in question was made.

The time factor has direct relevance to the objective that the Ohio courts are attempting to achieve: ascertainment of the true intent of the parties to the conveyance, as evidenced by the language they used. Intent, in Ohio law, is paramount, and the intent manifested in a given conveyance may be difficult to discern without knowing the time frame in which the conveyance was made.

In the days when underground mining was all there was, Ohio courts developed a strong presumption that a landowner who granted a mineral lease would not have intended to allow the lessee to undermine the surface to such an extent as to produce cave-ins or similar surface disturbances. See, for example, *Burgner v. Humphrey*, 41 Ohio St. 340 (1884), a deep mining case the first syllabus of which held as follows:

"If the owner of land grants a lease whereby he conveys all the underlying mineral coal, with the right to mine and

---

1. The terms "surface mining" and "strip mining" are used interchangeably to refer to the process by which coal is recovered by removing the overburden of trees, other vegetation, and soil, and scooping up the exposed coal by mechanical means. Current law requires restoration of the surface after the coal has been removed.

The term "deep mining" is used to refer to underground mining operations in which coal is extracted through tunnels and shafts. The residue produced in deep mining is known as "tailings."

remove the same, the lessee will not be entitled to remove the whole of the coal without leaving support sufficient to maintain the surface in its natural state, unless the language of the instrument clearly imports that it was the intention of the lessor to part with the right of subjacent support."

In *Ohio Collieries Co. v. Cocke,* 107 Ohio St. 238, 140 N.E. 356 (1923), another case that did not involve the assertion of a right to strip mine, the Ohio Supreme Court read *Burgner* as making the holder of the mineral estate strictly liable for damage to the surface, absent a clear showing that the parties had a contrary intent. Rejecting an argument that the grant of a right to mine at will impliedly granted immunity from liability for damage to the surface, the Ohio Supreme Court said that "the rule announced in *Burgner v. Humphrey, supra,* must prevail, and the intention of the party to part with the right of subjacent support must be shown by express grant, or be clearly imported in the instrument conveying the estate." 107 Ohio St. at 253, 140 N.E. at 361. As the court held in the second paragraph of its syllabus in *Cocke,*

"A sale of all the coal under a tract of land is not, in terms or by necessary implication, a release of the right to surface support, but such waiver must appear by express grant, or the instrument conveying the estate clearly import such release."

In 1974—by which time strip mining had become the predominant method of extracting coal in Ohio—the Ohio Supreme Court had occasion to consider a grant of mineral rights made in 1901, more than a decade before there was any strip mining in the state. In this case, *Skivolocki v. East Ohio Gas Co.,* 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374 (1974), the court considered for the first time whether the grant of a

mineral estate (here a grant of "all the coal in and under" a described parcel) implicitly included the right to strip mine for coal. The Ohio Supreme Court answered, in *Skivolocki,* that strip mining rights were not included, the parties to the deed not having manifested an intent that such rights should be included.

The analysis followed by the Ohio court in *Skivolocki* shows that the intent of the parties must be determined on a case-by-case basis. The task of the courts is one of "trying to ascertain the intent of the parties [with respect to the right to strip mine] at the time the deed was drawn," 38 Ohio St.2d at 248, 67 O.O.2d at 325, 313 N.E.2d at 377—and the relevant circumstances will vary, obviously, from case to case. Two salient facts were particularly helpful in illuminating the intent of the parties in *Skivolocki:* "the 1901 deed is coached [sic] in language particularly applicable to deep mining, and the evidence shows that the technique of strip mining was not known in Guernsey County [where the *Skivolocki* land was located] until 1917." *Id.* at 251, 67 O.O.2d at 329, 313 N.E.2d at 378. "Because strip mining is totally incompatible with the enjoyment of a surface estate," the Supreme Court declared against this background, "a heavy burden rests upon the party seeking to demonstrate that such a right exists." *Id.* The Court went on to say that "[t]his is especially true when the deed relied upon was executed prior to the time strip mining techniques became widely employed." *Id.* at 251, 67 O.O.2d at 329, 313 N.E.2d at 378–79.[2] Considerations such as these have an obvious bearing on the proper resolution of the issues presented in the case at bar.

### The Culbertson Tract

■ The instruments delineating the mineral estate in the Culbertson tract, like the deed at issue in *Skivolocki,* contain language "peculiarly applicable to deep mining tech-

---

**2.** Under Ohio's "syllabus rule" the actual holding is found in the Court's syllabus. The syllabus in *Skivolocki* reads as follows:

"1. Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.

"2. The right to strip mine for coal is not implicit in the ownership of a severed, mineral estate.

"3. A deed which severs a mineral estate from a surface estate, and which conveys the right to use the surface incident to mining coal, in language peculiarly applicable to deep mining techniques, does not grant the right to remove coal by strip mining methods."

niques." Numbered paragraph three of the Culbertson deeds reads as follows:

> "In new development work and operations, all reasonable and usual precautions required by the general mining laws for the support of the surface, will be made and to this end tunnels, shafts and other workings will be subject to inspection by the Forest Officer in charge and by mine inspectors of the United States."

The paragraph that immediately precedes this one reads as follows:

> "In prospecting for, and in mining or removing said coal, oil and gas and in manufacturing the products thereof, only so much of the surface as is reasonably necessary for the purpose, shall be used."

And paragraph number seven of the Culbertson deeds says this:

> "All mining operators shall in all future developments make reasonable provision for the disposal of tailings, dumpage and other deleterious material or substance in such a way as to prevent obstruction, pollution, or deterioration of lakes, ponds, or springs."

These references to mine tailings, tunnels, shafts, and surface support, coupled with the prohibition against using more of the surface than is reasonably necessary, leave no room for doubt that the type of mining contemplated by the parties to the Culbertson deeds was deep mining.

As stated in *Stewart v. Chernicky*, 439 Pa. 43, 52, 266 A.2d 259, 264 (1970), a decision quoted with approval in *Skivolocki*, 38 Ohio St.2d at 249–50, 67 O.O.2d at 327–28, 313 N.E.2d at 377–78, "[t]he right to mine and remove coal by deeds conveying land *in language peculiarly applicable to underground mining* does not include the right to remove such coal by strip mining methods." (Emphasis added by the *Skivolocki* court.) Just such language was used in the reservation of coal mining rights in the Culbertson deeds, and the rights so reserved did not include the right to remove coal by strip mining methods.

The express requirement in the Culbertson deeds that precautions be taken "for the support of the surface" is inconsistent with the notion that the parties intended to permit strip mining. A right of subjacent support of the surface is clearly pointless if the parties contemplate that the surface will be removed. "[S]trip mining," as the *Skivolocki* court observed, "necessarily and unavoidably causes total disruption of the surface estate." 38 Ohio St.2d at 248–49, 67 O.O.2d at 327, 313 N.E.2d at 377. And the fact that current regulations require the ultimate restoration of the surface does not diminish the force of this point.

It is true that uncontroverted evidence presented at the trial of this case indicates that in 1936, when the Culbertson deeds were executed, the area in which the Culbertson tract is located "was quite active in stripping for coal, clay and other mineral resources." Strip mining, the testimony suggests, was by then a "commonly used" practice in this area.[3] We do not find a single word in the Culbertson deeds, however, to suggest that the parties to the deeds had anything other than deep mining techniques in mind.

Of some significance, in this connection, is a compendium of Agriculture Department rules and regulations set out in the Culbertson deeds. The Department of Agriculture developed these regulations to govern the removal of minerals on lands acquired under the Weeks Act, and the regulations were required to be inserted in Weeks Act conveyances whenever mineral rights were reserved. The particular edition of the regulations incorporated in the Culbertson deeds, unlike later editions incorporated in the deeds to the Bauer, Simmering and Jenkins tracts, contained no reference to strip mining. The Culbertson deed regulations did refer specifically to underground mining, however. Like the main body of the Culbertson deeds, the attached regulations required that provision be made for support of the surface. To that end the regulations said

---

3. *Franklin v. Callicoat,* 68 Ohio L.Abs. 67, 53 O.O. 240, 119 N.E.2d 688 (Lawrence Common Pleas Court 1954), says that strip mining was not practiced in Lawrence County (the site of the Culbertson tract) before 1943. Belville was not a party to that case, however, and was not precluded from showing that strip mining actually began in that area earlier.

that "the tunnels, shafts, and other workings shall at all reasonable times be open to inspection and examination...." The regulations also prohibited the pollution of lakes, ponds or springs by "tailings," and called for special use permits for the construction of "structures such as mine shafts, tipples, derricks, pumphouses, hoppers, etc....." It is hard to imagine language more peculiarly applicable to underground mining.

Belville invites us to consider extrinsic evidence in connection with the Culbertson tract, including evidence that strip mining was expressly prohibited in other deeds executed contemporaneously; evidence as to the extent of the mineral rights discount reflected in the purchase price for the Culbertson tract; and evidence of a 1956 Forest Service recommendation that a special use permit be issued for prospecting for coal, clay and limestone "in accordance with the reservation in the [Culbertson] deed." (Clay can only be removed by surface techniques, and a 1957 Forest Service memorandum expressly mentioned "strip" mining as the purpose for which exploration was being conducted on the Culbertson tract.)

■ Under Ohio law, however, extrinsic evidence is admissible to illuminate the intent of the parties only where the terms of the deed are ambiguous. *Cf. Wells v. American Electric Power Co.,* 48 Ohio App.3d 95, 97, 548 N.E.2d 995, 997 (Vinton 1988) (an issue of fact is presented, making extrinsic evidence admissible, where "the language is capable of two reasonable, but conflicting interpretations;" no such issue is presented if "the deed shows exactly what the parties intended"); *Mead Corp. v. Jerome Goldberg & Cavalier Coal Corp.,* No. 78CA9, slip op. at 2, 1981 WL 5913 (Ct.App. for Gallia Co., Ohio, May 6, 1981) (parol evidence properly admitted to show intent as to strip mining where deed was ambiguous). Where the language of the deed is unambiguous, its proper interpretation is a question of law to be resolved by the court without resort to extrinsic evidence. *Alexander v. Buckeye*

*Pipeline Co.,* 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 408, 374 N.E.2d 146, 150 (1978).[4]

■ We discern no ambiguity in the language of the Culbertson deeds sufficient to justify resort to the highly particularized extrinsic evidence proffered by Belville. If we are wrong in this, however, it does not seem to us that the evidence is sufficient to overcome the natural import of the deeds' language, reading that language in the light of *Skivolocki.* The evidence as to contemporaneous deeds specifically prohibiting strip mining elsewhere does have some persuasive force, but it is hardly dispositive. The evidence on pricing is inconclusive. The evidence that the Forest Service interpreted the reservation of mineral rights as extending to clay—a mineral that can only be removed by strip mining—flies in the teeth of what the Culbertson deeds actually say. The only mineral rights reserved there relate to "coal, oil, [and] gas;" the deeds simply do not purport to reserve any right to extract clay.

### The Bauer and Simmering Tracts

We shall consider the Bauer and Simmering tracts together, since the wording of the deeds and the relevant extrinsic evidence are similar with respect to both tracts.

■ The Bauer and Simmering deeds differ from the Culbertson deeds in several significant respects. Both the Bauer and Simmering deeds grant the right to remove "clays and shales of Ohio," for one thing, and clays and shales of Ohio can only be removed through surface techniques. The use of "hydraulic" means is expressly prohibited in both deeds, but the use of other surface extraction techniques is not. Nowhere in the body of either deed do we find any language peculiarly applicable to underground mining, such as "tunnels," or "shafts," or "support of the surface." And incorporated in both deeds is a 1937 edition of the Forest Service's rules and regulations explicitly referring to the possibility of "stripping." This edition (which also refers to "tailings," incidently, but does not speak of "support of the surface," or "tunnels," or "mine shafts," etc.)

---

4. We realize that consideration of the mining techniques in common use at the time of the conveyance involves examination of matters *ali-* *unde* the deeds, but in practice the parol evidence rule has not precluded this kind of reference to the historic weltanschauung.

provides that if exercise of the mineral rights reserved in the deed will result in "stripping," the owner of the mineral rights shall pay the amount necessary to restore the land to a serviceable or safe condition.

The government notes that the regulations themselves do not confer a right to strip mine, but it seems to us that given their context, the regulations—which are no less a part of the deeds than any other part—clearly contemplate the possibility that exercise of the reserved right to remove coal, clays, and so forth will be accomplished by surface mining techniques. If it had not been intended to permit the extraction of coal through surface techniques, for one thing, it would have been totally unnecessary to carve. out an exception for hydraulic means, the sole surface technique the use of which is prohibited. And by the early 1940s, when these particular deeds were executed, strip mining was well on its way to becoming the predominant method of extracting coal from the ground in Ohio.

The language of the Culbertson deeds was clearly focused on underground mining, as we have seen, with many of the deeds' terms being peculiarly applicable to the use of deep mining techniques. The language of the Bauer and Simmering deeds was not focused on underground mining; that language included a specific reference to "stripping," on the contrary, and it is at least as likely as not that the parties intended that stripping be permitted. Resort to particularized extrinsic evidence is entirely appropriate, then, as far as the Bauer and Simmering deeds are concerned.

■ The evidence offered with respect to the Bauer and Simmering tracts shows that in the 1950s the government placed a practical construction on the relevant deeds that is contrary to the construction for which the government now argues. Now the government says that strip mining rights were not reserved. In the 1950s, however, the reserved mineral owners of both the Bauer and Simmering properties were allowed to conduct surface mining operations under Forest Service permit. The Forest Service is a branch of the Department of Agriculture, and the representatives of the Service were doubtless in as good a position as anyone to know what the representatives of the Secretary of Agriculture had in mind when they purchased the Bauer and Simmering tracts in the 1940s. We find no error in the district court's determination that strip mining was permitted under the Bauer and Simmering deeds.

### The Jenkins Tract

In 1950, when the government acquired the Jenkins tract, strip mining was the predominant method of extracting coal in Ohio. The terms of the Jenkins deed were comparable to those of the Bauer and Simmering deeds, and, as noted above, strip mining operations were conducted on the Jenkins tract in the 1960s pursuant to Forest Service permit. If we are correct in our conclusion as to the Bauer and Simmering tracts, we have no doubt at all that a right to strip mine coal was reserved in the Jenkins deed.

There was a question, however, as to whether the reservation of the right to strip mine remained in effect on the Jenkins tract after 1989. The reservation was to expire at the end of that year, according to the deed, unless it should be shown by the grantors "that mining operations have been conducted to commercial advantage for an average of at least 100 days per year, during the preceding five year period...." The deed provides that in such event, subject to certain limitations, "the said right to mine shall be extended for a further period of five years...."

Belville cannot show, as far as we know, that mining operations were conducted in the manner stated during the five year period ending on December 31, 1989. The district court held, nonetheless, that "[s]ince the Plaintiff sought and received from Defendant a determination prior to December 31, 1989 that it possessed 'valid existing rights' (VER), the reservation will be deemed to be in full force and effect at this time." 763 F.Supp. at 1416. The government has not challenged this holding; without expressing any view as to whether the district court was correct, we affirm the holding on the ground that it has not been questioned here.

### III[5]

#### 1.

The district court concluded that, although Belville possessed VER in the Bauer, Jenkins, and Simmering tracts, Belville did not possess VER in the Culbertson tract. However, the court also found that OSM lacked either express or inherent authority to reconsider its initial determinations that Belville did possess VER in the four tracts. The district court reasoned, first, that nothing in SMCRA indicated, either explicitly or implicitly, that Congress had authorized OSM to reverse its "final" decisions. Second, the court found that, even assuming an inherent power to reconsider, Belville's change of position in reliance on the 1988 determinations precluded reconsideration. Finally, in the district court's view, although reconsideration for purposes of correcting clerical errors is within an agency's inherent power, OSM's reconsideration impermissibly was motivated by a change in policy. Therefore, concluded the court, OSM was without authority to reconsider and reverse any of its 1988 determinations.

Whether OSM had the authority, under the circumstances of this case, to reconsider and reverse its earlier VER determinations is unquestionably an issue of law. Therefore, we review *de novo* the district court's conclusion on this issue. We hold that OSM had the authority to reconsider and reverse these determinations to the extent that they were erroneous.

▮▮▮ In determining whether agency reconsideration is proper in a given case, "two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." *Civil Aeronautics Bd., v. Delta Air Lines, Inc.,* 367 U.S. 316, 321, 81 S.Ct. 1611, 1616, 6 L.Ed.2d 869 (1961) (foot-note omitted). The authority of an agency to reconsider an earlier determination may be expressly conferred by statute. *Marshall v. Monroe & Sons, Inc.* 615 F.2d 1156, 1158 (6th Cir.1980); *Bookman v. United States,* 197 Ct.Cl. 108, 453 F.2d 1263, 1265 (1972). Even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision. *Dun & Bradstreet Corp. Found. v. United States Postal Serv.,* 946 F.2d 189, 193 (2d Cir.1991); *Mazaleski v. Treusdell,* 562 F.2d 701, 720 (D.C.Cir.1977); *Bookman,* 453 F.2d at 1265. The Secretary of the Interior has the inherent authority to reconsider an earlier agency decision. *Ideal Basic Indus., Inc. v. Morton,* 542 F.2d 1364, 1367–68 (9th Cir.1976).

▮▮▮ The district court found that SMCRA neither specifically authorizes OSM to reconsider its VER determinations nor contains the sort of broad language that would constitute implicit statutory authorization for reconsideration. However, Section 201(c) of SMCRA, 30 U.S.C. § 1211(c), entitled "Duties of Secretary," provides, in part, that

> [t]he Secretary, acting through [OSM], shall—
>
> (1) ... review and vacate or modify or approve orders and decisions....
>
>   *   *   *   *   *   *

We find that this statutory provision expressly authorized OSM to review and vacate the erroneous 1988 VER determination.

The applicable regulations also indicate that OSM has the authority to reconsider an earlier determination. Subpart A of Volume 43 of the Code of Federal Regulations, which is entitled "Public Lands: Interior," sets forth general rules and regulations governing administrative appeals, including appeals to the Board of Land Appeals, which has juris-

---

5. Except for a renumbering of footnotes and slight modifications to reflect the panel's views on the substantive validity of the final VER determinations, the part that follows is taken verbatim from a proposed opinion circulated by Judge Batchelder. Preparation of the court's opinion had been assigned to her initially, but her views on certain of the questions discussed above proved not to have the support of a majority of the panel. At Judge Batchelder's request, responsibility for writing a majority opinion was then reassigned. Judges Kennedy and Nelson concurred in Judge Batchelder's analysis of the government's right to change its mind with respect to the Culbertson tract, and we present that analysis here without material change.

diction over administrative appeals involving SMCRA. 43 C.F.R. § 4.1(b)(3) (1991). Section 4.5, entitled **"Power of the Secretary and Director,"** provides, in part:

> (a) *Secretary.* Nothing in this part shall be construed to deprive the Secretary of any power conferred upon him by law. The authority reserved to the Secretary includes, but is not limited to:

>       \*      \*      \*      \*      \*      \*

> (2) The authority to review any decision of any employee or employees of the Department, ... or to direct any such employee or employees to reconsider a decision, except a decision by the Board of Contract Appeals[,] which is subject to the Contract Disputes Act of 1978.

>       \*      \*      \*      \*      \*      \*

These regulations thus expressly authorize the Secretary, acting through OSM, with one exception not relevant here, to reconsider "any decision" of "any employee or employees of the Department," *id.*, which would necessarily include a VER determination by an OSM employee.

Even if an agency lacks express statutory authority to reconsider an earlier decision, an agency possesses inherent authority to reconsider administrative decisions, subject to certain limitations. *Rutherford v. United States,* 806 F.2d 1455, 1460 (10th Cir.1986); *Ideal Basic Indus.,* 542 F.2d at 1367; *Bookman,* 453 F.2d at 1265. However, the district court found that, even assuming OSM had inherent authority to reconsider, reconsideration was improper in the present case both because it was based on policy grounds and because it occurred after Belville had changed its position in reliance on the initial agency decision.[6] As to the first of these reasons, the district court rejected the government's explanation for reconsideration, namely, that the 1988 VER determinations had been procedurally and substantively deficient; instead, the court found that, because a Congressional investigation prompted reconsideration, and there was a contemporaneous change in directors

at OSM, reconsideration impermissibly had been motivated by policy changes. We disagree and find that OSM properly exercised its inherent authority to reconsider and reverse its 1988 VER determination with respect to the Culbertson tract.

We recognize that a change in directors occurred at OSM during the relevant time period, and we also recognize that a Congressional investigation, at least in large measure, was the catalyst for reconsideration. However, we believe the record indicates that the underlying reason for reconsideration was a legitimate concern that the 1988 determinations had serious procedural and substantive deficiencies. This case is thus distinguishable from a situation in which an agency uses "the power to correct inadvertent ministerial errors ... as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *American Trucking Ass'ns, Inc. v. Frisco Transp. Co.,* 358 U.S. 133, 146, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958) (citing *United States v. Seatrain Lines, Inc.,* 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947)). *See also Upjohn Co. v. Pennsylvania R.R. Co.,* 381 F.2d 4, 5 (6th Cir.1967) (where "only basis" for reversal of previous decision is adoption of different policy, Interstate Commerce Commission lacked authority to "apply retroactively its new policy").

Belville has presented no evidence, beyond the timing of the change in leadership, to suggest that the new Director of OSM, in initiating reconsideration in this instance, was attempting to change existing policy rather than to correct erroneous VER determinations. The Investigative Report of the Subcommittee on Mining and Natural Resources, which criticized the Belville VER determinations, concluded that, because the administrative record concerning the 1988 determinations was so deficient, a court challenge would probably result in a finding that the decision was unlawfully arbitrary and capricious.

---

**6.** At oral argument, Belville stated that it had hired employees in preparation for mining operations and had entered into a contract to deliver

a substantial quantity of coal that it anticipated would be mined on these four tracts.

The inadequacy of OSM's 1988 determinations is obvious: The determinations regarding these four tracts are contained in a conclusory one-and-a-quarter-page letter consisting of nine sentences. The letter contains absolutely no legal analysis or factual explanation regarding the VER determinations. Furthermore, as found by a Congressional subcommittee, the determinations were based exclusively on the oral advice of a staff attorney and a single district court case from Ohio.[7]

The situation before us thus is not one in which OSM, based only on policy reasons, has decided to adopt one legally supportable position rather than another. Rather, it is clear that OSM here attempted to correct legally erroneous 1988 VER determinations that, left uncorrected, would be vulnerable to court challenge because of the wholly inadequate process by which these determinations were reached. Because the deficiencies in the 1988 VER determinations, rather than a change in policy, were the basis for reconsideration, the *American Trucking Ass'ns* and *Upjohn* cases are inapposite.

██ We also find that Belville's reliance on the 1988 VER determinations does not preclude OSM reconsideration of this decision. The authorities cited by Belville and the district court are not to the contrary. In

*McAllister v. United States,* 3 Cl.Ct. 394 (1983), the United States Claims Court considered the issue of whether a government agency may reconsider an earlier agency decision after the agency becomes aware that one of the parties has acted in reliance on the initial decision.[8] The Claims Court in that case granted summary judgment for the plaintiff on the grounds that the initial decision was not erroneous, and the plaintiff had relied on this decision. In so doing, however, the court did not suggest that reliance on an agency's decision inevitably would preclude reconsideration. The court instead adopted a narrower position:

> "[B]arring a showing of error, an agency may reconsider its final decision only if the reconsideration is timely and the parties have not adversely changed their positions in reliance on that decision.... If the parties act on the initial decision, however, and if the agency knows they will act, then the *agency may reverse its initial decision only upon a showing that it was erroneous.*"

*Id.* at 398 (emphasis added). We already have found that the initial VER determination with respect to the Culbertson tract was erroneous. Therefore, under the reasoning of *McAllister*, reliance on the erroneous VER determination is no bar to reconsideration, based on OSM's inherent agency authority.[9]

---

7. *Sunday Creek Coal Co. v. Hodel,* No. C–2–88–0416 (S.D.Ohio June 2, 1988). This earlier case is inapposite to the present case, because it involved a deed that "specifically reserved the right to remove the minerals by surface mining...." *Id.* at 1.

8. In *McAllister*, the plaintiff, a civilian schoolteacher, worked for the Department of Defense Dependent School in England. Following reassignment to a new duty station, she requested and, on October 10, 1980, received from Jeffrey Dander, the individual in charge of Permanent Change of Station ("PCS") determinations, a determination that she was eligible for PCS. As a result of this eligibility, she qualified for an extension of Living Quarters Allowance, in reliance on which she then incurred expenses that would have been reimbursable under this determination. However, on November 12, 1980, after she had incurred these expenses, plaintiff was notified by Dander's superior that, because the original determination was erroneous, PCS was being denied. The hearing examiner upheld this denial. Plaintiff brought an action in Claims Court and subsequently moved for summary judgment.

9. The other cited reliance cases also are inapposite. In *Faircrest Site Opposition Comm. v. Levi,* 418 F.Supp. 1099 (N.D.Ohio 1976), the court found that agency equivocation did not constitute arbitrary and capricious conduct. The court did not address the issue of whether reliance on an initial agency decision could be a factor in determining whether reconsideration was timely. In *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States,* 177 Ct.Cl. 184, 1966 WL 8893 (1966), the court stated that it was "especially dangerous" for an agency to reconsider an earlier decision when there had been "reliance on the assumed finality of the decision." *Id.* at 191, 1966 WL 8893. However, because "the initial determination had not passed beyond [the Commission's] control" in that case, *id.* at 192, 1966 WL 8893 and thus there could be no presumption of finality, this language was *dicta*. Thus, neither of these cases supports Belville's position.

Having found that OSM had the authority to reconsider its initial determinations, we need not address the argument that estoppel cannot be invoked against the government with respect to

2.

The district court also found that OSM's reconsideration was untimely and, therefore, that OSM had waived the right to reconsider. Although this presents a closer question, we hold that, under the facts of this case, OSM's reconsideration was timely.

The general rule regarding whether an agency reconsideration decision is timely is that, "absent contrary legislative intent or other affirmative evidence, this court will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable time period." *Bookman v. United States*, 453 F.2d at 1265. *See also Dawson v. Merit Sys. Protection Bd.*, 712 F.2d 264, 267 (7th Cir. 1983); *Alberta Gas Chem., Ltd. v. Celanese Corp.*, 650 F.2d 9, 13 (2d Cir.1981). "What is a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years." *Gratehouse v. United States*, 206 Ct.Cl. 288, 512 F.2d 1104, 1109 (1975). *See also Mazaleski v. Treusdell*, 562 F.2d at 719–20.[10] Once this reasonable time period has run, "there is no longer an opportunity to correct the procedural error retroactively." *Gratehouse*, 512 F.2d at 1109.

■ In reaching the conclusion that OSM reconsideration was untimely, the district court relied, in part, on OSM rules and regulations. *See* 43 C.F.R. §§ 4.1390–94 (1991). Section 4.1391 states, in part:

(a) The applicant or any person with an interest which is or may be adversely af-

fected by a determination of [OSM] that a person holds or does not hold a valid existing right ... may file a request for review of that determination....

\*  \*  \*  \*  \*  \*

(b)(1) ... The request for review of a determination under section (a) ... shall be filed within 30 days....

\*  \*  \*  \*  \*  \*

(c) Failure to file a request for review within the time specified in paragraph (b) of this section shall constitute a waiver of the right to review and the request shall be dismissed.

The district court determined that, by not giving Belville notice of reconsideration until almost eight months after the initial determination, OSM failed to comply with the regulation's 30-day appeal period in § 4.1391. Therefore, found the court, OSM had failed to act within "a presumptively 'reasonable time.'" *Belville Mining Co.*, 763 F.Supp. at 1422. The district court reasoned that, coupled with Belville's reliance on the 1988 determinations, this failure barred reconsideration.

■ We find that Section 4.1391, by its plain terms, was not intended to apply to reconsideration decisions initiated by OSM. OSM is neither an applicant nor a "person with an interest which is or may be adversely affected" by a VER determination. Therefore, the 30-day notice and waiver provisions are inapplicable.[11] In the absence of an ex-

---

the reconsideration determinations. We also need not address the argument that OSM lacked the authority to bind the government by an erroneous VER determination, because we have concluded that OSM had the authority to reconsider and reverse its earlier positive VER determination.

10. Recently, the United States Claims Court has articulated a more liberal approach to the issue of whether agency reconsideration is timely. *See Crager v. United States*, 25 Cl.Ct. 400, 410–11 (1992) ("Although Assistant Secretary Bergquist's *de novo* review was not really conducted within a short time, this court still believes that effective, unbiased *de novo* review of agency action should be promoted, regardless of the time which has lapsed."). In *Crager*, the Claims Court finding that an almost two-year period was not untimely appeared to have been

motivated, in part, by a finding that the Assistant Secretary undertaking the reconsideration review was unbiased and by the fact that the reconsideration decision affirmed, rather than reversed, the earlier decision. *Id.* at 411.

11. Nor do we believe, given the complexity of this VER determination and the inherent differences between a single adversely affected "person" and an agency, that application of this 30-day notice requirement to OSM is compelling as a matter of logic. *See Ideal Basic Indus.*, 542 F.2d at 1367 (appeals regulation made applicable to "[a]ny party adversely affected ..." is not intended to preclude those who are responsible for managing public lands from "undertaking, or requesting, in a timely manner[,] a reconsideration of a decision ...").

Belville cites to cases in which courts have applied specific time limitations to agency recon-

press time limitation within which OSM may, on its own initiative, reconsider an earlier decision, we must, therefore, determine whether, under the particular facts of this case, the eight months between notice of the 1988 determinations and notice of suspension and reconsideration of those determinations was a "short and reasonable period." [12]

We initially note that neither party has identified unusual circumstances that take this case outside the general rule. We also note that the eight-month time period involved here is intermediate between the weeks that, at least in the view of some courts, represent a presumptively reasonable period and the years that do not. *See, e.g., Gratehouse,* 512 F.2d at 1109. [13]

Recently, in the context of considering an appeal from a district court decision granting a motion to dismiss under Rule 12(b)(6), the Second Circuit enumerated three factors relevant to a determination of whether an agency reconsideration decision was timely: "We believe that a determination of whether the 'time-lapse' [81 weekdays] was reasonable will turn on, among other things, the complexity of the refund decision, whether the decision was factually or legally based, and whether the [agency] acted according to its general procedures for review." *Dun & Bradstreet Corp. Found.,* 946 F.2d at 194. Another court examined the following factors in concluding that an agency reconsideration decision was untimely: 1) the express time limit for appeals set forth in the regulations had run; 2) legally cognizable property interests had arisen through the initial decision; 3) the plaintiff had acted in reliance on the initial decision; and 4) the agency had attempted to use the pretext of fraud to justify reconsideration. *Prieto v. United States,* 655 F.Supp. 1187, 1192–93 (D.D.C.1987). To the factors enumerated by these courts we would add another factor we believe to be relevant here: the probable impact of an erroneous agency decision absent reconsideration. *Cf. Civil Aeronautics Bd.,* 367 U.S. at 321, 81 S.Ct. at 1616 (desirability of finality must be weighed against public interest in reaching the correct result).

Weighing these factors, especially the complexity of the VER determinations, the absence of any showing of bad faith on the part of OSM, the fact that at the time OSM gave notice of suspension and reconsideration, Ohio had not issued permits allowing strip mining, and the likely impact of a decision to allow strip mining on national forest property

sizeration decisions. However, two of these cases involve regulations containing time limitations that, by their very terms, applied to the agencies as well as aggrieved parties. *See Concerned Citizens of Bridesburg v. United States Envtl. Protection Agency,* 836 F.2d 777, 786 (3d Cir.1987); *Spanish Int'l Broadcasting Co. v. Federal Communications Comm'n,* 385 F.2d 615, 621 (D.C.Cir.1967). In the third case, the court assumed, without deciding, that the ten-day appeal period for parties would also apply to agency-initiated reconsideration decisions. *Confederated Tribes,* 177 Ct.Cl. at 191–92.

12. We deem this eight-month period between the initial determinations and the notice of suspension thereof to be the relevant time frame. As of August 24, 1989, Belville was on notice that the positive VER determinations had been suspended and were actively under reconsideration.

13. *See also Mazaleski,* 562 F.2d at 720–21 (offer by agency to plaintiff to reopen administrative proceedings, which was made approximately one month after initial decision, when agency first learned of its error, was not untimely); *Ideal Basic Indus., Inc. v. Morton,* 542 F.2d at 1367 (Where reconsideration was requested within one month of original decision, even though re-

consideration decision was not handed down until approximately 21 months later, "broad plenary powers" of the Secretary of the Interior "over the disposition of public lands" gave Secretary the authority to reconsider); *Gratehouse,* 512 F.2d at 1110 ("In the instant case, [the government's] offer of a ... hearing 2 years after a hearing could have been held was far too late to qualify as reconsideration."); *Bookman,* 453 F.2d at 1265–66 (reconsideration decision issued almost four months after rendering of initial decision was timely); *C.J. Langenfelder & Son, Inc. v. United States,* 169 Ct.Cl. 465, 341 F.2d 600, 604 (1965) (Where application for reconsideration was made more than a year after the original decision, this period was "much more than a reasonable period.'"); *Gabbs Exploration Co. v. Udall,* 315 F.2d 37 (D.C.Cir.) (27 years between alleged administrative wrong and attempt to correct it held untimely), *cert. denied,* 375 U.S. 822, 84 S.Ct. 61, 11 L.Ed.2d 56 (1963); *Crager,* 25 Cl.Ct. at 411 (Although review almost two years after initial decision was "not really conducted within a short time," reconsideration decision nonetheless was held timely.); *Umpleby v. Udall,* 285 F.Supp. 25, 30 (D.Colo.1968) (challenge to administrative decision made sixteen years after original decision held untimely).

on which Belville does not possess VER, we conclude that reconsideration occurred within a reasonable time. We believe that the public interest in achieving a correct result here especially tips the scales in favor of a finding that reconsideration was timely. If the initial agency determination that Belville possesses VER in the Culbertson tract were found to be binding, even in the absence of VER, the probable result would be surface mining and the denuding of thousands of acres of national forest property that, pursuant to Congressional mandate, the Secretary of Agriculture has designated for inclusion in a national forest. SMCRA's reclamation requirements notwithstanding, the fact remains, as found by the district court, that 100 years would elapse, following reclamation, before a new forest would replace the old one. *Belville Mining*, 763 F.Supp. at 1420.[14]

On balance, and taking all these factors into consideration, we believe that the eight-month time period between the 1988 determinations and the notice to Belville that these determinations were under reconsideration was reasonable. Therefore, we find that OSM reconsideration, and subsequent reversal, of its 1988 VER determinations was timely.

## IV

We hold, first, that Belville had a valid existing right to strip mine on the Bauer, Jenkins and Simmering tracts, but not on the Culbertson tract. Second, we hold that OSM had the authority to reconsider and reverse its erroneous determination as to the existence of a valid existing right in the Culbertson tract, and we hold that Belville's reliance on the erroneous determination did not bar reconsideration. Finally, we hold that reconsideration was timely. The judgment of the

district court is **REVERSED** as to the Culbertson tract and **AFFIRMED** as to the remaining tracts.

BATCHELDER, Circuit Judge, dissenting.

### I.

In Ohio, the surface rights and the mineral rights to a given tract of land may be conveyed separately. *Gill v. Fletcher*, 74 Ohio St. 295, 302, 78 N.E. 433 (1906). However, the Ohio Supreme Court has held[1] that "[t]he right to strip mine for coal is not implicit in the ownership of a severed, mineral estate" and that the inclusion of "language peculiarly applicable to deep mining techniques" in a deed "convey[ing] the right to use the surface incident to mining coal" does not, without more, allow the grantee to strip mine the coal. *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374 (1974). The Court has also held that the surface owner has "[t]he right of subjacent support of the surface in its natural state" and that the mineral estate holder is strictly liable for damage to the surface; for this reason,

> [a] sale of all the coal under a tract of land is not, in terms or by necessary implication, a release of the right to surface support, but such waiver must appear by express grant, or the instrument conveying the estate clearly import such release.

*Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 140 N.E. 356 (1923). *See also Burgner v. Humphrey*, 41 Ohio St. 340 (1884) (in absence of clear waiver of subjacent support, mineral estate lessee required to "leav[e] support sufficient to maintain the surface in its natural state"). In keeping with this well-

---

**14.** Because of the impact that the 1988 VER determination, if found binding, would have, the present case is distinguishable from those cases in which courts have found reconsideration decisions affecting a single individual to be untimely. *See, e.g., Prieto*, 655 F.Supp. at 1192 (denial of trust status of land belonging to plaintiff, an American Indian, who hoped to erect and lease billboards on land); *Gratehouse*, 512 F.2d at 1109–10 (denial of plaintiff's request to withdraw his resignation from agency); *Langenfelder*, 341 F.2d at 604–05 (denial of additional payment to plaintiff for difficulties encountered in excavation

work). Here, a finding that OSM is barred from reconsideration will have an impact extending far beyond a single individual.

**1.** Only the syllabus preceding an opinion of the Ohio Supreme Court is considered binding law; the opinion itself has only the persuasive force of dicta. *State v. Wilson*, 58 Ohio St.2d 52, 60, 12 O.O.3d 51, 388 N.E.2d 745 (1979); *Cassidy v. Glossip*, 12 Ohio St.2d 17, 41 O.O.2d 153, 231 N.E.2d 64 (1967).

settled law, the *Skivolocki* Court stated that "strip mining is totally incompatible with the enjoyment of a surface estate," and for this reason "a heavy burden rests upon the party seeking to demonstrate that such a right exists." *Skivolocki*, 313 N.E.2d at 378.

In my estimation, none of the deeds put forth by Belville contains either the requisite express release or waiver of the right to subjacent support of the surface estate, or language specifically and unambiguously reserving to the grantors the right to strip mine coal or other minerals. I therefore am able to join only in the court's conclusion that the Culbertson deeds do not permit strip mining (although I disagree with some of the factors the court considered in reaching that conclusion, as I shall presently explain) and in Part III of the court's opinion, regarding the prerogative of the Office of Surface Mining to reconsider and reverse its own decisions regarding valid existing rights.

## II.

1. *The Culbertson deeds.*

The Culbertson deeds each contain an identical reservation clause, "[r]eserving to the Grantor, his executors, heirs, administrators, and assigns, the right to prospect for, mine, remove and/or produce coal, oil [and] gas. . . ." Under Ohio law, where such a reservation is made, "a covenant is implied on the part of the person who is to work the mines that he will so conduct his operations as to leave sufficient support for the surface." *East Ohio Gas Co. v. James Bros. Coal Co.*, 85 N.E.2d 816, 818–19 (Ct. Common Pleas Ohio 1948) (citing, *inter alia*, *Burgner* and *Cocke*). As the *Skivolocki* court recognized, shaft or "deep" mining disrupts the surface estate, to be sure, see 313 N.E.2d at 376, but "strip mining is *totally incompatible* with the enjoyment of a surface estate," *id.* at 378 (emphasis added). Thus, where a deed conveys the surface estate, and simply reserves a "right to mine coal," one must assume that

the parties anticipate only deep mining.[2] Such is the case with regard to the Culbertson deeds.

The majority, however, goes on to examine a series of subsequent paragraphs in the Culbertson deeds, noting that they "contain language 'peculiarly applicable to deep mining techniques.'" Op. at 993–94. The three paragraphs of interest to the court provide that the grantee is to take

all reasonable and usual precautions . . . for the support of the surface . . . and to this end tunnels, shafts, and other workings will be subject to inspection by the Forest Officer in charge and by mine inspectors of the United States.

. . . . .

In prospecting for, and in mining or removing said coal, oil and gas and in manufacturing the products thereof, only so much of the surface as is reasonably necessary for the purpose, shall be used.

. . . . .

All mining operators shall in all future developments make reasonable provision for the disposal of tailings, dumpage and other deleterious material. . . .

These provisions do mention deep mining techniques. For the majority, this language leaves "no room for doubt" that the Culbertson deeds did not permit strip mining. However, as I shall discuss at greater length in the context of the next set of deeds, in which the court did find rights to strip mine, I think the court errs in looking to this language of limitation to find words enunciating an unambiguous intent on the part of the grantors to reserve rights to strip mine and convey a surface interest that is subject to complete destruction at their will.

2. *The Bauer, Simmering, and Jenkins[3] Deeds.*

These deeds reserve to the grantors "the right to prospect for and mine by means

---

2. The Pennsylvania Supreme Court, in a decision followed by the Ohio Supreme Court in *Skivolocki*, concluded similarly, using much the same reasoning. *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259, 264 (1970).

3. I include the Jenkins deed in this discussion, since I agree with the majority that it in essence contains the same terms as do the Bauer and Simmering deeds. Inasmuch as I think the Jenkins deed does not reserve the right to strip mine, I need not address the issue of the five year

other than hydraulic, which is prohibited, manufacture and remove coal, oil, gas brine, clays and shales of Ohio." The majority notes the compelling appearance of the words "clays and shales of Ohio" in what is properly considered the granting clause, and observes that clays and shales may only be removed through strip mining. Looking at the rest of the deed, which sets out limits on the exercise of the reserved mineral rights, the court discovers language typically associated with strip mining, and one mention of strip mining itself. The court also notes that in the 1950s, the Forest Service issued strip mining permits to the mineral owners of these tracts; under the doctrine of "practical construction," where the Government has so acquiesced in strip mining on its property, the Secretary may not now be heard to deny that the mineral estates include "valid existing rights" to strip mine.

A. *Deep mining versus strip mining.*

As quoted above, *Skivolocki* held that

[a] deed which severs a mineral estate from a surface estate, and which conveys the right to use the surface incident to mining coal, in language peculiarly applicable to deep mining techniques, does not grant the right to remove coal by strip mining methods.

313 N.E.2d at 375. I believe the court makes two mistakes of logic in applying this case, and its predecessor, *Cocke*, which held that only an express waiver of subjacent support permits enjoyment of mineral rights while escaping strict liability for damage done to

the surface. 107 Ohio St. at 238, 252–54, 140 N.E. 356.

First, the court implicitly holds that where a deed includes language "peculiarly applicable" to *strip* mining techniques, then the parties probably intended the owner of the mineral rights to be able to extract the deposits by surface mining. See Op. at 995–96. In so holding, the court improperly argues that the converse follows from the premise. As I discussed above, where a deed conveys or reserves a generalized mineral right separate from the surface estate, the presumed method of extraction must be deep mining, regardless of whether the parties specified that deep mining techniques be used.[4] Deep mining disrupts the surface estate to some degree, but it may be done with care such that tunnel collapse, gas explosions and the like do not partially or entirely destroy the surface estate; nonetheless, the miner remains strictly liable to the surface owner for any such damage. Hence the holdings in *Ohio Collieries v. Cocke*, which arise from the maxim that each owner of the mineral and surface estates "must use his own, as not to injure the property of the other." *Burgner*, 41 Ohio St. at 352 (*quoted in Cocke*, 107 Ohio St. at 254, 140 N.E. 356). *See also Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259, 264–65 n. 9 (1970) (followed by *Skivolocki*) (analogizing surface estate to servient estate in an easement, and noting that "[t]he owner of the dominant estate may not exercise rights granted to it without regard to the rights of the servient owner."). As the *Skivolocki* court recognized, mineral rights to be enjoyed by strip mining cannot coexist with a

---

4. The majority also considers that by the 1950s, strip mining was the predominant method of mining in Ohio, and concludes that deeds executed during and after that time most likely presumed that the owners of mineral rights would use strip mining to enjoy their estates. *Skivolocki* took this into consideration as well, albeit by pointing out that a deed executed in 1901 certainly did not anticipate the advent of strip mining and therefore the parties to it cannot be thought to have intended to subjugate the surface estate to the mineral estate. I have my doubts as to whether this dicta means that once strip mining was popular, then even in the absence of a clear indication of intent to waive the surface

extension of the mineral rights' expiration date in the context of this appeal.

rights, deeds conveying general mineral rights implicitly permitted strip mining. The fact remains, as *Skivolocki* unequivocally states, that strip mining is "totally incompatible with the enjoyment of a surface estate." 313 N.E.2d at 378. I recognize that courts, including this Circuit, do consider whether strip mining was in use or "technologically feasible" at the time a deed was executed in illuminating the intent of the parties to permit such techniques. *United States v. Stearns Coal & Lumber Co.*, 816 F.2d 279, 283 (6th Cir.1987). Such evidence, however, is extrinsic evidence properly considered only where the deed itself is ambiguous. *See Kelly v. Marsh*, 1989 WL 18869 (citing *Long v. Olinger*, 16 Ohio Law Abs. 182 (1933)).

surface estate, since the surface estate may in essence be revoked at the whim of the mineral owner.

The majority seems to denigrate the *Burgner* and *Cocke* cases, despite the fact that they begat *Skivolocki,* because they "did not involve the assertion of a right to strip mine." Op. at 993. But, as I have noted, the concerns for property rights of the surface estate owner giving rise to the earlier cases are greater, not less, in the context of an assertion of strip mining rights, as I think *Skivolocki* itself illustrates. The requirements that the parties unambiguously and unmistakably intend to permit strip mining, and that the grantee of the surface estate intend to waive his right to subjacent support and thus leave his enjoyment of the surface subject to subsequent destruction, must, in my estimation, be viewed narrowly, with the assumption being that a reservation or conveyance of a mineral estate does not automatically render the surface estate and the rights to enjoy it inferior.[5] *See Peabody Coal Co. v. Erwin,* 453 F.2d 398, 399 (6th Cir.1971) (*per curiam* ) ("[T]he deed ... does not indicate the intention of the parties that the mineral owner bought the right to destroy the surface, or that it was intended that the mineral owner's rights to use the surface would be superior to any competing right of the surface owner.' "). *See also Smith v. Moore,* 172

Colo. 440, 474 P.2d 794, 796 (1970) (where deed contains no express waiver of right to subjacent support by surface estate owner, to permit holder of reserved mineral rights to strip mine "would in effect be holding that the grantor retained everything he granted by his deed, and that the grantee received nothing"). Thus, *Skivolocki* cannot be interpreted to mean that the appearance in a deed of "language unique to strip mining techniques" in and of itself implies that strip mining was intended, and, more importantly, that the surface owner has completely waived his right to enjoyment of that estate.

B. *The parties' practical construction of the deeds.*

I turn next to the majority's reliance on the permits to strip mine issued by the Forest Service many years prior to the enactment of SMRCA. I think that the issuance of a permit to strip mine and recognition of an unlimited right to strip mine, thereby depriving the United States of its entire surface estate, are two different things for our purposes. Without a doubt, the Government may waive its rights to subjacent support and permit unlimited strip mining on any piece of land it owns, regardless of whether the relevant deed reserved strip mining rights. However, these particular permits were limited in scope,[6] they are no longer in

---

**5.** Under the common law, the mineral estate was dominant over the surface estate, giving the mineral rights owner the right to use "so much of the surface as is reasonably necessary" to explore for and extract the minerals, as well the right of access over the surface estate for these purposes. 6 Rocky Mountain Mineral Law Foundation, *American Law of Mining* § 200.-02[1][b][i] (Cheryl Outerbridge, ed., 2d ed. 1992). However, the common law also forbade the dominant estate owner from exercising his rights "without regard to the rights of the servient owner," and depriving the subservient estate owner his right to enjoy the surface by destroying or unreasonably harming it. *Stewart,* 266 A.2d at 264–65 n. 9. As this discussion indicates, the late nineteenth- and twentieth-century cases have moved away from the idea that the mineral estate is dominant, toward an equality of interests, for example by requiring the mineral owner to maintain the subjacent support of the surface. *American Law of Mining, supra* § 200.02[1][b][i].

**6.** And, perhaps more importantly, these permits were issued long before the Surface Mining Control and Reclamation Act became law, which

imposed strict regulations on strip mining, among them the requirement that Federal or Federally-approved state permits be obtained prior to the commencement or continuation of *any* surface mining. 30 U.S.C. §§ 1252, 1256. As the majority notes, SMCRA banned surface mining in the National Forests outright, 30 U.S.C. § 1272(e), subject to those "valid existing rights" in existence on August 3, 1977. Since SMCRA recognizes the validity of preexisting permits only in one minor context, that of mining conducted on "prime farmland," 30 U.S.C. § 1260(d), to derive unlimited strip mining rights by implication from permits issued twenty years prior to the advent of SMCRA does violence to the statutory scheme. I fear the majority has not only "grandfathered" all preexisting permits, but has, as discussed, read a general waiver of the surface estate into a limited waiver granted by permit, which now may be derived even from expired permits. I believe such unlimited rights to be neither "valid" nor "existing."

effect, and one would suspect that some coal remains in the ground, since the permits allowed mining only in specified areas. The law may bind parties to a mineral rights conveyance who acquiesce to the use of certain mining methods, in the absence of a contract provision permitting those methods, or even where the deed prohibits those methods, particularly where the parties' course of conduct is consistent over time. *See New York Coal Co. v. New Pittsburgh Coal Co.*, 86 Ohio St. 140, 99 N.E. 198 (1912). An express waiver of a right to the use of a specific part of the surface estate, made for a limited duration, as was the case here, however, certainly cannot be considered a permanent waiver of rights to the entire surface estate.

### C. *Deriving intent from mandatory deed clauses.*

Third, the court observes in the Bauer and Simmering deeds' language that the parties "clearly contemplate[d] the possibility that exercise of the [mineral rights] will be accomplished by surface mining techniques." Op. at 996. Besides the mention of hydraulic mining, the court notes that at the time the deeds were executed (the early 1940s) strip mining was on the rise, and that the regulatory language in the deeds "was not focused on underground mining, [but] included a specific reference to 'stripping.'" *Id.*

The problem is this: Federal regulations promulgated by the Secretary of Agriculture required that all such deeds incorporate this language.[7] After the advent of the Weeks Act in 1911, every deed conveying land to the United States and reserving mineral rights to the grantors incorporated the same provisions, essentially generally applicable regula-

tions on the exercise of the reserved mineral rights. Recall that the majority explained that the regulations incorporated into the Culbertson deed contained "language 'peculiarly applicable to deep mining techniques,'" Op. at 993–94; the court presumed that the general reservation of rights did not intend to encompass strip mining. The regulations had evolved by 1942, no doubt to reflect that "strip mining was well on its way to becoming the predominant method of extracting coal from the ground in Ohio" and elsewhere. Op. at 996. Hence, we find language applicable to strip mining in the regulatory clauses of the Bauer and Simmering deeds.

While the law of Ohio, reflecting the common law, requires a court to examine the "four corners" of a conveyance to determine the intent of the parties, *Hinman v. Barnes*, 146 Ohio St. 497, 32 O.O. 564, 570, 66 N.E.2d 911, 916 (1946) and while these regulations are technically part and parcel of the deed, a court cannot properly derive from this regulatory language an intent to reserve or convey any particular rights. In the context of these deeds, the *regulations at best constitute conditions or limitations on the grantor's general reservation of mineral rights.*[8] A limitation or condition only exists in reference to an affirmative conveyance; where the terms of a reservation are in "seeming repugnance to the granting clause," the granting clause controls, and the limiting clause "'has no validity or effect whatever.'" *Johnson v. Darling*, 32 O.C.A. 113, 118 (Ohio App.1921) (quoting *Ball v. Foreman*, 37 Ohio St. 132, 141 (1881)). Therefore, one cannot infer from the provision of a condition or limitation the general right it purports to delimit if the general right is not itself defined independently. And if there be any

---

7. In 1911, Congress enacted 36 Stat. 961, under which the Secretary of Agriculture promulgated a series of regulations which were to be appended to, and incorporated in, any conveyance of land to the United States which reserved mineral rights to the grantors. *See Stearns Coal and Lumber,* 816 F.2d at 283. Indeed, in the conveyances discussed here, the government-printed page listing the regulations was simply appended to each deed.

8. Note the preliminary language of the regulation as it appears on the government-printed page appended to the deeds:

> Whoever begins such [mining] operations must, on demand, exhibit to the Forest Officer in charge *satisfactory evidence of authority from the grantor so to do,* and must comply with the following requirements[.]

As might be expected, the regulations require that the right to mine be specifically reserved in its entirety in the conveyance, and that such rights do not somehow derive from the regulations themselves, which only limit the means by which such rights may be enjoyed.

doubt as to the interest the grantor has purportedly reserved to himself, "an exception or reservation in a conveyance is construed in favor of the grantee rather than of the grantor," since the deed reflects the words of the grantor. *Pure Oil Co. v. Kindall,* 116 Ohio St. 188, 156 N.E. 119 (1927) (*quoted in Campbell v. Johnson,* 1993 WL 146516 (May 5, 1993)). Importantly, "a reservation in behalf of the grantor will not be enlarged beyond the fair and natural import of the language used." *Wolf v. Roberts,* 30 Ohio Op. 499, 42 Ohio Law Abs. 449, 451 (1945) (*quoted in Campbell,* 1993 WL 146516).

Hence, I believe it improper to look to language that is present in the deed only by virtue of government edict to illuminate the intention of the parties. If we do so, then we today hold that all deeds conveying Ohio land to the Government now incorporated in the National Forests which reserve general mineral rights to the grantors, but contain neither explicit waivers of subjacent support nor explicit reservations of strip mining rights *in their granting clauses,* permit unlimited strip mining by the mineral rights owners. Far from "ascertain[ing] the true intent of the parties to the conveyance, as evidenced by the language they used," we will, in many if not most cases be ignoring the intention of the parties, by looking not at language the parties used, but at language the Government made them use, this mandatory language ironically meant to regulate and limit the exercise of reserved mining rights.

D. *Prohibition of hydraulic mining.*

Fourth, I can give no weight to the Simmering and Bauer deeds' prohibition of hydraulic mining. The Weeks Act prohibited hydraulic mining and, pursuant to Federal regulation, this prohibition appears in the deeds, as do the other limitations already discussed. *See, for example, United States v. Stearns Co.,* 595 F.Supp. 808, 810 (E.D.Ky. 1984), *aff'd,* 816 F.2d 279. As with the other regulations, this mandatory provision should not be considered to reflect any particular intent of the parties.

### III.

There is no dispute that each of the grantors intended to convey land to the Federal Government for inclusion in the National Forests.[9] Neither do the parties dispute that the grantors reserved certain mineral rights in making these conveyances. The question is whether the parties intended both to convey to the Government the surface estate subject to a waiver of the right to enjoy that very estate, and to reserve to the grantors the right to exploit their mineral estates by means of destroying the surface. The parties could certainly agree in writing to such a conveyance, but the law requires that their intentions be set out clearly in writing, or if the deed be unclear, that the circumstances of the execution of the deed unmistakably show that the parties intended such a result. I think that none of these deeds supports Belville's claim to strip mining rights, and for that reason, I respectfully dissent.

---

9. Interestingly, the Federal Government established the National Forests and acquired forest land for them for the purpose of "timber production and the protection of navigable waters and environs." *Stearns,* 595 F.Supp. at 811; *see also* 1 *American Law of Mining* § 4.12. They were not originally intended for recreational public use. *Id.*